# IN THE MATTER OF JOHN C. McBRIDE.

Suffolk. January 3, 2007. - May 14, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Attorney at Law,* Disciplinary proceeding, Disbarment. *Administrative Law,* Substantial evidence, Proceedings before agency. *Evidence,* Administrative proceeding.

Substantial evidence supported the Board of Bar Overseers' conclusion that the respondent in a bar discipline matter intentionally misappropriated client funds [160-163]; moreover, there was no merit to the respondent's claim that the sanction of disbarment was markedly disparate from sanctions imposed in similar cases [163-165], or that he was prejudiced by delays in the disciplinary proceedings [165-166].

INFORMATION filed in the Supreme Judicial Court for the county of Suffolk on November 22, 2004.

The case was heard by *Sosman,* J.

*Thomas J. Butters* for the respondent.

*Roger Geller,* Assistant Bar Counsel.

IRELAND, J. Bar counsel filed a three-count petition for discipline against the respondent, John C. McBride, on November 24, 1999. The Board of Bar Overseers (board) held hearings between December, 2000, and April, 2002. The hearing committee's report, submitted on December 11, 2003, found multiple violations of the rules of professional conduct and recommended a three-year suspension. Both bar counsel and McBride appealed to the board. The board unanimously adopted bar counsel's recommended sanction of disbarment, and filed an information to that effect in the county court. A single justice concluded that McBride was not prejudiced by any delay in the disciplinary proceedings and ordered that McBride be disbarred from the practice of law for his numerous violations of the rules governing professional conduct, including intentionally misappropriating client funds. McBride appealed from that decision.

He argues that the single justice erred in relying on the hearing committee's flawed finding that he intentionally misappropriated client funds. He also argues that he was prejudiced by delays in the disciplinary proceeding and that the sanction of disbarment is markedly disparate from sanctions imposed in similar cases. We affirm the decision of the single justice ordering disbarment.

1. *Background.* We limit our summary of the facts found by the hearing committee and adopted by the board concerning three client matters, to those relevant to the issues McBride raises, and reserve details for our discussion.

a. *Count one.* McBride represented the members of the Stallworth family in a series of proceedings arising from the arrest of Aubrey Stallworth, Jr. (Stallworth), on drug and firearm offenses in June, 1993. McBride represented Stallworth at his criminal trial; on the appeal from Stallworth's convictions; and in a State forfeiture proceeding involving jewelry, cocaine, $175,000, and several guns that were seized from his house after his arrest. McBride also represented Stallworth's parents, Aubrey Stallworth, Sr., and Bettye Stallworth, in Federal forfeiture proceedings involving two cars that were seized at the same time. Aubrey and Bettye initially paid McBride $1,500 to work on their son's criminal appeal.[1] There was no fee agreement for his work on the State forfeiture case, and neither Stallworth nor his parents gave McBride authority to settle that case.

On December 16, 1994, McBride agreed with an assistant district attorney on terms favorable to Stallworth for a settlement in the State forfeiture proceeding. The agreement provided for the return of $50,000 and all the jewelry. McBride was anxious to finalize the agreement as quickly as possible, and sent a letter to Stallworth, who was in prison, seeking approval of "the government's offer" and requesting an immediate response. He then knowingly misrepresented to the assistant district attorney that he had authority to settle the case on Stallworth's behalf when McBride knew he had no such authority. On December 19, before McBride's letter reached him, Stallworth was transferred to a different prison. That same day, Mc-

---

[1]Aubrey and Bettye had paid $15,000 for McBride's representation of Stallworth at his criminal trial.

Bride and the assistant district attorney agreed to the settlement even though McBride had not yet received authority from Stallworth to do so.

The next day, December 20, 1994, McBride wrote to Stallworth's parents that "[w]e have entered into an agreement" to settle the State forfeiture case and that his fee was "one third of the amount of money and property that is recovered." The letter also explained that his fee to represent Stallworth in the appeal from his criminal convictions would be $15,000. On December 21, a check made out to Stallworth for $50,000 was sent to McBride as part of the forfeiture settlement. At McBride's instruction (and without Stallworth's permission), his bookkeeper then indorsed the check and deposited it into McBride's IOLTA account. On December 22, again at McBride's instruction, the bookkeeper transferred $30,166.67 of the $50,000 from the IOLTA account to McBride's business operating account.

On December 23, 1994, McBride met with Stallworth's parents to sign a fee agreement. A letter accompanying the fee agreement described the forfeiture settlement as "pending." The agreement itself included a claim that Aubrey had power of attorney to authorize the settlement on behalf of his son. McBride knew that Aubrey had no such authority. The fee agreement provided that one-third of the amount recovered in the settlement, $16,666.67, would be paid to McBride as his fee for his work on the State forfeiture case. It also provided for payment of the $13,500 still owed for representing Stallworth in his criminal appeal. This was the first time that a fee agreement had been reached for the criminal appeal. In total, Stallworth's parents agreed to pay McBride $30,166.67. McBride did not tell them that he had already taken that amount from the forfeiture settlement. Stallworth was notified of the settlement and the fee agreements on December 27.

On January 5, 1995, McBride visited Stallworth in prison. During the visit McBride agreed to lower his fee for the criminal appeal from $15,000 to $5,000.[2] He did not immediately return $10,000 to his IOLTA account.

---

[2]McBride also agreed to omit the value of the jewelry from the calculation of his forfeiture fee. The fee agreement provided that McBride's fee would be one-third of the value of all property recovered, including the jewelry, but

By January 26, 1995, Stallworth had discharged McBride. They agreed that of the $15,000 that had been paid for his work on the criminal appeal, McBride would keep only $1,150. On January 27, McBride returned $25,683.33 by check, accompanied by an accounting of the money he had been paid.[3] McBride failed to account for the first $1,500 that the Stallworths had paid for the criminal appeal, and he did not include that amount in his check. On March 6 he returned an additional $500. He never returned the last $1,000 that he owed.

On April 12, 1996, the Drug Enforcement Agency (DEA) contacted McBride as part of the investigation of the petition for remission that McBride had submitted on behalf of Aubrey and Bettye seeking return of the cars in the Federal forfeiture proceeding. Between April and August the DEA made repeated requests for information about the source of the funds used to purchase the cars, including Aubrey and Bettye's tax returns. McBride never asked Aubrey or Bettye directly for the information; instead, on April 15 and June 3, McBride sent letters to Stallworth notifying *him* of the DEA's request for information from his parents. On August 21, McBride told the DEA that he was no longer representing Aubrey and Bettye. He did not tell Aubrey or Bettye. Aubrey and Bettye never provided the tax returns and, as a result, the DEA denied Aubrey and Bettye's petition for remission. The hearing committee found that by failing to notify them of the request for their tax returns, McBride harmed Aubrey and Bettye by denying them the opportunity to prove that they had sufficient income to purchase the cars.

Based on these findings, as well as others not relevant to this appeal, the single justice affirmed the board's finding of multiple violations of S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (4), (5), and (6), as appearing in 382 Mass. 769 (1981); Canon 2, DR 2-106 (A), as appearing in 382 Mass. 772 (1981); Canon 2, DR

there is no record that the Stallworths ever paid any amount based on the value of the jewelry.

[3]McBride had made several payments to the Stallworths from the settlement amount during January, 1995, totaling $6,500. The $25,683.33 represented the $50,000 settlement less the $6,500 in payments to the Stallworths, $16,166.67 for McBride's forfeiture fee, and $1,150 for the criminal appeal.

2-110 (A) (3), as appearing in 411 Mass. 1318 (1992); Canon 6, DR 6-101 (A) (2) and (3), as appearing in 382 Mass. 783 (1981); Canon 7, DR 7-101 (A) (1), (2), and (3), as appearing in 382 Mass. 784 (1981); and Canon 9, DR 9-102 (A) and (B), as appearing in 419 Mass. 1303 (1995).

b. *Count two.* Count two arises from McBride's work for a group of seventeen stock brokers suing their former employer for breach of an employment contract. One of the brokers was Shandal von Wood. The brokers hired an attorney, John Doe, in the spring of 1995.[4] Doe was a new lawyer. A fee agreement established a twenty-five per cent contingent fee, and Doe agreed to cap all expenses at $300 for each broker, paid in advance. In November of that year McBride hired Doe as an associate in his firm, and Doe brought the brokers with him as clients. Doe notified McBride of the twenty-five per cent contingent fee, but did not tell him about the $300 per broker cap on expenses, or that the expenses had already been paid.

On July 8, 1997, an arbitration panel awarded the brokers $342,175. The employer failed to pay by the requisite deadline. McBride negotiated a new payment plan with the employer. As part of that plan the employer paid McBride $50,000 on October 28. McBride appropriated the entire payment as his fee because he believed he was only obligated to credit the settlement payments to the brokers after his entire fee had been paid. McBride instructed Doe to inform the brokers of the payment and McBride's fee. Doe notified every broker except for von Wood, whom he was unable to reach. All the brokers except von Wood agreed to allow McBride to take his full fee out of the initial payments.

On November 4, 1997, von Wood learned of the payment and wrote to McBride demanding his share of the $50,000. Through von Wood's letter McBride learned for the first time about the $300 cap on fees. McBride instructed Doe to arrange a new plan with the brokers to pay his fees. The next day, all of the brokers, including von Wood, agreed to a plan under which McBride would make quarterly payments out of all settlement

---

[4]Doe's conduct also was the subject of a petition for discipline. See *Matter of the Discipline of an Attorney*, 448 Mass. 819 (2007).

funds received in the previous quarter. McBride agreed to take his fee as a percentage of each quarterly payment.

On November 28 and December 15, 1997, the employer failed to make the next two scheduled payments. On December 17, two days after the scheduled date of McBride's first quarterly payment, von Wood demanded his portion of the $50,000 October payment. The next day, the employer made a second payment of $50,000. Over Doe's objections, McBride retained the entire $50,000 October payment as his fee. He kept $25,025 from the December payment, and sent checks to the brokers for their share of the remaining $24,975. A letter drafted by Doe and reviewed by McBride accompanied the checks. The letter explained that the checks were for the brokers' "pro rata share of the $50,000 [employer] payment minus fees to McBride and Associates." It explained that McBride took $12,500 as his twenty-five per cent contingent fee and $12,500 for expenses. The letter did not mention the December payment. Within a few days Doe notified some of the brokers of the December payment, but not von Wood. The hearing committee found that the letter was misleading to all those who were never notified of the second payment.

On January 21, 1998, von Wood filed a complaint with bar counsel objecting to McBride's withholding $12,500 in expenses, claiming that the brokers had prepaid all expenses and that the expenses had been capped at $300 each. In February, McBride directed Doe to repay von Wood and the other brokers their respective shares of the $12,500 in expenses withheld from the October payment. Letters explaining the refund again failed to mention the December payment. The next day Doe sent a letter to bar counsel, reviewed by McBride, responding to questions arising from von Wood's complaint. That letter, too, failed to mention the December payment. The hearing committee found that both letters were misleading because they intentionally hid the second payment.

In April, 1998, McBride learned that the employer was bankrupt and unlikely to make future payments. He sent a letter to all brokers disclosing the December payment and including checks for the brokers' shares of the second $50,000. Sometime in the next few months McBride also disclosed the second payment to bar counsel.

Based on these findings, as well as others not relevant to this appeal, the single justice affirmed the board's finding of violations of DR 1-102 (A) (4), (5), and (6); DR 2-106 (A); DR 7-101 (A) (1), (2), and (3); DR 9-102 (A), (B), and (C); and, for those violations occurring after January 1, 1998, Mass. R. Prof. C. 1.15, 426 Mass. 1363 (1998), and Mass. R. Prof. C. 8.4 (c), 426 Mass. 1429 (1998).

c. *Count three.* Yves Felix was serving a sentence for various drug offenses that allowed for the possibility of a suspended sentence on completion of a substance abuse program. After Felix completed the program, Felix's brother Emmanuel paid McBride $2,250 to help Felix get his sentence suspended. Seven months after he was hired McBride filed one notice of appeal from the denial of an earlier pro se motion that Felix had filed. Felix later filed a second pro se motion, which was also denied, followed by a pro se motion for reconsideration and a request for an evidentiary hearing.[5] The court ordered a hearing in response to Felix's request. McBride failed to appear at the hearing. The court continued the hearing to accommodate McBride's absence, but stated that it would not do so a second time. At the second hearing McBride again failed to appear. Felix appeared pro se, and a judge suspended his sentence. McBride refused to repay his fee to Felix's brother, arguing that he had earned the fee. McBride eventually returned the money, but not until more than one year had passed. The hearing committee concluded that McBride's neglect of Felix's case caused Felix to spend at least five additional months in prison.

Based on these findings, as well as others not relevant to this appeal, the single justice affirmed the board's finding of violations of DR 6-101 (A) (2) and (3); DR 7-101 (A) (1), (2), and (3); and, for violations occurring after January 1, 1998, Mass R. Prof. C. 1.16 (d), 426 Mass. 1369 (1998); Mass R. Prof. C. 1.2 (a), 426 Mass. 1310 (1998); and Mass R. Prof. C. 1.3, 426 Mass. 1313 (1998).

2. *Discussion.* a. *Intentional misappropriation of client funds.* McBride argues that the single justice erred in concluding that he intentionally misappropriated client funds. With respect to

---

[5]Felix filed these pro se motions while he was represented by McBride.

count one, he argues that the single justice relied on findings of the hearing committee that were flawed because they omitted reference to a December 23 telephone call from Stallworth to McBride, and because they credited the testimony of Aubrey and Bettye.[6] With respect to count two, McBride argues that the hearing committee's findings do not support the single justice's conclusion that he intentionally misappropriated client funds. Finally, he urges us to reject the board's conclusion in both counts one and two that he intentionally misappropriated client funds, in favor of the hearing committee's conclusion that he did not.

The board may revise "the findings of fact, conclusions of law and recommendation of the hearing committee" but the hearing committee remains "the sole judge of the credibility of the testimony presented at the hearing." S.J.C. Rule 4:01, § 8 (4), as appearing in 425 Mass. 1309 (1997). "[A]lthough not binding on this court, the findings and recommendations of the board are entitled to great weight." *Matter of Fordham*, 423 Mass. 481, 487 (1996), cert. denied, 519 U.S. 1149 (1997). "[S]ubsidiary facts found by the [b]oard and contained in its report . . . shall be upheld if supported by substantial evidence, upon consideration of the record." S.J.C. Rule 4:01, § 8 (4). "[A]s long as there is substantial evidence, we do not disturb the board's finding, even if we would have come to a different conclusion if considering the matter de novo." *Matter of Segal*, 430 Mass. 359, 364 (1999).

McBride's claim that the hearing committee's findings are flawed is without merit. He asserts that the findings are flawed in part because they credit the testimony of Stallworth, Aubrey and Bettye, three "highly suspect witnesses." The hearing committee, however, is the sole judge of credibility, and arguments

---

[6]McBride also argues several errors in the hearing committee's findings for count one that are unrelated to intentional misappropriation. He contends that the hearing committee misinterpreted the December 16 and December 23 letters to imply that he knew he lacked the authority to settle the forfeiture case and that he attempted to conceal his unauthorized settlement. He also argues that the hearing committee erroneously concluded that his one-third fee for the forfeiture case was excessive. We disagree. We have reviewed the record and conclude that there was substantial evidence in the record to support each finding.

hinging on such determinations generally fall outside the proper scope of our review. *Matter of Abbott*, 437 Mass. 384, 394 (2002), and cases cited. As to the December 23 telephone call, the only evidence concerning its content was the testimony of McBride's bookkeeper, Diane Berman. She testified that during the short conversation McBride told Stallworth he had received $50,000 from the government and had taken his fee, and Stallworth said, "Whatever my mother wants . . . give her the check." The absence of mention of a telephone call in the hearing committee's report does not imply that it was overlooked. Either the hearing committee did not credit Berman's testimony, or it considered Stallworth's call to be something less than ratification of the fee agreement. We find no fault with the hearing committee's findings.

McBride next argues that he is not responsible for any deceitful conduct with respect to von Wood because he had no direct client contact. Although the misleading letters were drafted by Doe, they were written at McBride's instruction, and at least one of the letters was reviewed by him. The single justice concluded that the letters represented McBride's attempt to hide his misappropriation of payments that were unambiguously owed to his clients. This conclusion is supported by substantial evidence.

Finally, McBride argues that the single justice should have deferred to the hearing committee's conclusions that McBride did not intentionally misappropriate client funds. The hearing committee's report implicitly concluded that McBride did not intentionally misappropriate Stallworth's funds when it described McBride's act as "negligent misuse of clients funds, with actual deprivation and no restitution." In count two, the hearing committee found that "there was no intent to hide the payment to deprive the clients of their money in the long run, it was simply to avoid a confrontation with one of the clients over the timing of the payments." The hearing committee also concluded that McBride's actions "did not constitute conversion" of von Wood's funds. The board concluded explicitly that McBride's misappropriation was intentional. We defer to the hearing committee's determinations on credibility, but for findings of fact the board's conclusions will be upheld as long as

they are supported by substantial evidence. S.J.C. Rule 4:01, § 8 (4). McBride took $30,166.67 from Stallworth's forfeiture settlement, failed promptly to return $10,000 after agreeing to lower his fee, and has still failed to repay $1,000 owed to Stallworth. He also failed to pay von Wood his share of a $50,000 settlement payment for over four months, keeping the money over the objections of his own employee, Doe, while misleading von Wood into thinking that no payment had been made. In each instance he knew the funds belonged to his client, yet he still kept them for himself. The single justice did not err when she affirmed the board's conclusion that he intentionally misappropriated client funds because that conclusion is supported by substantial evidence.

b. *Appropriate sanction.* The single justice adopted the recommendation of the board to disbar McBride. When reviewing sanctions imposed by the single justice we give substantial deference to the board's recommendation. *Matter of Foley*, 439 Mass. 324, 333 (2003). *Matter of Finn*, 433 Mass. 418, 423 (2001). Our review is to ensure that the sanction is not markedly disparate from judgments in comparable cases. *Matter of Barrett*, 447 Mass. 453, 462 (2006). *Matter of Alter*, 389 Mass. 153, 156 (1983). We review the sanction to determine "what measure of discipline is necessary to protect the public and deter other attorneys from the same behavior," *Matter of Barrett, supra* at 463, quoting *Matter of Concemi*, 422 Mass. 326, 329 (1996), and in that review we consider "the effect upon, and perception of, the public and the bar." *Matter of Alter, supra.*

When an attorney "intended to deprive the client of funds, permanently or temporarily, or if the client was deprived of funds (no matter what the attorney intended), the standard discipline is disbarment or indefinite suspension." *Matter of Schoepfer*, 426 Mass. 183, 187 (1997). McBride intentionally misappropriated client funds, and based on this conclusion alone the single justice's sanction of disbarment is not markedly disparate. But even if, as McBride contends, his misuse of client funds was less than intentional, the hearing committee found, and the board and the single justice agreed, that his actions resulted in clients' being deprived of their funds. Disbarment, therefore, would remain the presumptive sanction.

McBride contends that when compared to similar cases, disbarment is a markedly disparate sanction, arguing that more egregious behavior resulted in lesser sanctions. We disagree. Of the cases on which McBride relies to support his argument, all but one were decided before *Matter of Schoepfer, supra,* established the standard recited above.[7] Moreover, the one case he cites that was decided after the *Schoepfer* case, *Matter of Kerlinsky,* 428 Mass. 656, cert. denied, 526 U.S. 1160 (1999), did not involve misappropriation or misuse of client funds. Our recent cases are consistent with the holding in the *Schoepfer* case. See, e.g., *Matter of Dasent,* 446 Mass. 1010, 1012-1013 (2006) (imposing sanction of disbarment where attorney intentionally misused client funds, failed to repay full amount owed, committed multiple ethical violations, and showed no special mitigating factors); *Matter of Dragon,* 440 Mass. 1023 (2003) (disbarring attorney who intentionally deprived clients of funds). McBride also contends that most cases resulting in disbarment arose from criminal conduct. He is mistaken. There was no crime committed in either the *Dasent* or *Dragon* case but disbarment was imposed in each case nonetheless.

Although we conclude that misappropriation of client funds alone justifies disbarment, the sanction is further supported by the numerous aggravating factors found by the hearing committee, and the absence of any mitigating factors that would warrant lessening McBride's sanction. *Matter of Finn, supra* at 424-425 (mitigating and aggravating factors important element in determination of appropriate sanction). The most significant of these is the cumulative effect of McBride's numerous violations in addition to misappropriation of funds, including neglect that resulted in the forfeiture of Aubrey and Bettye's two cars and Felix's additional five months in prison. See *Matter of Palmer,* 413 Mass. 33, 38 (1992) ("it is appropriate for us to

---

[7]In *Matter of Schoepfer,* 426 Mass. 183, 186 (1997), this court acknowledged that, although "disbarment or indefinite suspension is the presumptive sanction if a lawyer has intentionally deprived a client of funds . . . [i]n deciding what discipline to impose . . . we have not applied that standard with consistency." The court stated that "[t]he uneven disposition of past disciplinary cases concerning the misuse of clients' funds requires us not to try to decide whether the sanction we impose is reasonably consistent with sanctions heretofore imposed in similar cases." *Id.* at 188.

consider the cumulative effect of the several violations commit- ted by the respondent"). The hearing committee also cited a public censure in 1993 and private reprimand in 1989 for incidents strikingly similar to those in counts one and two. In addition, the hearing committee found that McBride's clients were unsophisticated criminal defendants,[8] that he was an experienced attorney,[9] and that he showed a "reckless disregard for the truthfulness of his statements" to bar counsel.

c. *Delay.* McBride argues that he was prejudiced by bar coun- sel's failure to file a prompt petition, and the hearing committee's delays in scheduling hearing dates. McBride asks us to declare the proceedings invalid and to dismiss count three, or to reduce the discipline by considering the delay as a mitigating factor. We decline to do so.

There were numerous legitimate reasons for the delays in the disciplinary proceedings against McBride. Some of the delay in bar counsel's bringing a petition was because of the many complaints made against McBride, and bar counsel's decision to wait to consolidate the three grievances included in this case. The delay in scheduling hearing dates was in part due to continuances granted to accommodate McBride's trial schedule. Most important, however, we conclude that McBride was not prejudiced by the delay. Mere delay in disciplinary proceedings does not result in dismissal. *Matter of Gross*, 435 Mass. 445, 450 (2001). *Matter of London*, 427 Mass. 477, 481 (1998). The effect of a delay in disciplinary proceedings is considered as a mitigating factor only if an attorney is prejudiced by that delay.

---

[8]McBride argues that the hearing committee should not have concluded that his clients were vulnerable. He points to Stallworth's attempts to sue McBride for damages as examples of Stallworth's legal sophistication. He also argues that Stallworth's requests for copies of trial transcripts and his ability to negotiate a lower fee are further evidence of his sophistication. McBride provides no legal support for his contention that those facts lessen the vulner- ability of incarcerated criminal defendants. He also does not contest the vulnerability of Felix, his client in count three. The hearing committee found multiple aggravating factors and no mitigating factors. Even if the single justice had discounted the vulnerability of McBride's clients, the sanction of disbarment would still not have been markedly disparate from those imposed in similar cases.

[9]McBride had been running his own law firm since 1982. He had an active trial practice, and published and lectured on both search and seizure and forfeiture issues.

See *Matter of Grossman*, 448 Mass. 151, 159 & n.8 (2007). The only prejudicial result claimed by McBride was the unavailability of Felix's brother, Emmanuel, to testify before the hearing committee.[10] In February, 2000, Emmanuel signed a statement, later submitted to the hearing committee, that he did not want to pursue a complaint against McBride. By the time of the hearing McBride was unable to locate Emmanuel, and now contends that the result of the Felix matter would have been different had Emmanuel been available to testify. As the single justice noted, however, McBride had the opportunity to preserve Emmanuel's testimony as late as February, 2001, but chose not to. Accordingly, he cannot now argue prejudice from his inaction.

*Judgment affirmed.*

---

[10]McBride also claims in passing that the hearing committee's delay prejudiced him because it caused him stress, it caused his firm to lose clients and attorneys, and a newspaper article about the disciplinary proceedings produced negative publicity. These claims are made in the last sentences of his brief, with no factual or legal support. They do not rise to the level of appellate argument. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).