## In the Matter of Gary C. Crossen.

Suffolk. October 4, 2007. - February 6, 2008.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, & Botsford, JJ.

*Attorney at Law,* Disciplinary proceeding, Attorney-client relationship, Disbarment. *Board of Bar Overseers. Rules of Professional Conduct. Due Process of Law,* Attorney disciplinary proceeding.

In a bar disciplinary proceeding, there was no merit to the respondent's argument that professional norms prevalent in 1997 obligated him to vindicate his clients' interests by investigating allegations of misconduct by the judge in an ongoing litigation involving the respondent's clients via a sham job interview with the judge's former law clerk, and via other actions designed to trick or coerce the law clerk into making sworn statements he otherwise would not have made, where, as the special hearing officer found, the respondent could have pursued, and was aware that he could have pursued, a number of legitimate avenues to investigate the claims against the judge [554-556]; further, both the respondent's participation in the sham interview conducted in New York (which included surreptitious tape recording and involved dishonesty, fraud, deceit, or misrepresentation, false statements, and fraudulent conduct) and his subsequent attempts to threaten the law clerk into making statements under oath that would discredit the judge in the litigation involving the respondent's clients manifestly worked to the prejudice of the administration of justice and impugned the respondent's own bona fides as an attorney [557-561]; likewise, his threats to disclose embarrassing or compromising statements that the law clerk had made during the sham job interview in New York and an earlier sham job interview in Canada (including information that the law clerk, in connection with his bar application, had submitted a letter of recommendation from an a person whom he did not know) bordered on outright extortion [561-563]; finally, the respondent's conduct could not be excused as zealous representation according to contemporary standards, where the duty of zealous advocacy did not extend to engaging in conduct intended to harm the orderly administration of justice or the public's perception of unbiased adjudication, and where the respondent studiously kept himself unenlightened about the ethical propriety of his conduct and misled others about his inquiries into the matter [563-565].

In a bar disciplinary proceeding, there was no merit to the respondent's argument that, at the time he chose to investigate allegations of misconduct by a judge in an ongoing litigation involving the respondent's clients by means of a sham job interview with the judge's former law clerk, and other actions designed to trick or coerce the law clerk into making sworn statements he otherwise would not have made, the respondent reasonably

believed that as a private attorney he was empowered to use the same investigative techniques that would have been available to government attorneys, including the ploy of a "pretextual" interview where ascertaining the truth by less covert means likely would not have been possible, given the lack of oversight of private attorneys to ensure that any undercover investigations they might conduct meet the constitutional requirements of fair and impartial justice. [565-568]

The respondent in a bar disciplinary proceeding failed to demonstrate that S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (5), as appearing in 382 Mass. 769 (1981), proscribing conduct prejudicial to the administration of justice, was so broad as to raise a due process concern about potential random application, even as a stand-alone basis for sanctions, which was not the case here [568-569]; further, the special hearing officer did not err in excluding the testimony of the respondent's proposed expert or that of experts proffered by his corespondents [570-572], in striking the respondent's affirmative defense of selective prosecution [572], or in refusing to issue the respondent's requested subpoenas [572-573].

This court concluded that disbarment was the appropriate sanction for an attorney who chose to investigate allegations of misconduct by a judge in an ongoing litigation involving the respondent's clients by means of a sham job interview with the judge's former law clerk, and other actions designed to trick or coerce the law clerk into making sworn statements he otherwise would not have made, where the ethical rules implicated were not murky and the respondent did not act in good faith [573-577]; where the delay in the prosecution of the respondent's case did not prejudice the respondent's defense, and the prolonged public opprobrium that the respondent faced did not require mitigation, given that he would have been disbarred had the petition been filed in a timely manner and that he has been permitted to continue practicing law until now [577-579]; and where the respondent's substantial experience, his marked lack of candor in the disciplinary proceedings, and his total lack of concern and compassion for how the ruse would affect the law clerk, the judge, and their families weighed in aggravation [580-582].

INFORMATION filed in the Supreme Judicial Court for the county of Suffolk on December 5, 2006.

The case was reported by *Greaney*, J.

*Thomas R. Kiley* for the respondent.

*Nancy E. Kaufman*, Assistant Bar Counsel.

MARSHALL, C.J. Attorney Gary C. Crossen contests an information filed in the county court by the Board of Bar Overseers (board) recommending that Crossen be disbarred for his part in an intricate plan to discredit a Superior Court judge presiding in an ongoing matter in which he represented some of the litigants. The aim of the plan was to influence the outcome of the litiga-

tion by forcing the judge's recusal and obtaining reversal of her prior rulings against Crossen's clients. In furtherance of the scheme, Crossen, with his own investigators posing as corporate executives, set up and secretly made a tape recording of a sham job interview for a former law clerk of the judge, during which the law clerk repeatedly was questioned about the judge's personal and professional character and her decision-making process in the ongoing matter involving Crossen's clients. Although the "interview" with the law clerk did not yield the information Crossen had hoped, Crossen did not change course. He redoubled his efforts to malign the judge for the benefit of his clients by using a tape recording of the interview to coax and then threaten the law clerk into providing sworn statements damaging to the judge, which the law clerk otherwise would not have made.

Bar counsel alleged that Crossen's conduct violated S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (2) and (4)-(6), as appearing in 382 Mass. 769 (1981),[1] and Canon 7, DR 7-102 (A) (5) and (7), as appearing in 382 Mass. 785 (1981).[2] The matter was tried to a special hearing officer appointed by the board. The board adopted, with minor exceptions, the special hearing of-

---

[1]In relevant part, S.J.C. Rule 3:07, Canon 1, DR 1-102, as appearing in 382 Mass. 769 (1981), provides:

"(A) A lawyer shall not:

". . .

"(2) Circumvent a Disciplinary Rule through actions of another.

". . .

"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

"(5) Engage in conduct that is prejudicial to the administration of justice.

"(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

[2]In relevant part, S.J.C. Rule 3:07, Canon 7, DR 7-102, as appearing in 382 Mass. 785 (1981), provides:

"(A) In his representation of a client, a lawyer shall not:

ficer's extensive findings and conclusions, as well as her recommendation that Crossen be disbarred. A single justice reserved and reported the matter to the full court.

We adopt the board's recommendation. The record leaves no doubt that Crossen was a willing participant, and at times a driving force, in a web of false, deceptive, and threatening behavior designed to impugn the integrity of a sitting judge in order to obtain a result favorable to his clients. The scope of this misconduct has scant parallel in the disciplinary proceedings of this Commonwealth. This was not conduct on the uncertain border between zealous advocacy and dishonorable tactics, a border about which reasonable minds may differ. It struck at the heart of the lawyer's professional obligations of good faith and honesty. Crossen's conduct was so egregious and extensive that no reasonable attorney could have believed it comported with the solemn ethical obligations of attorneys. It caused harm to the orderly administration of justice, as well as to the law clerk, the judge, and their families, and it harmed public confidence in the legal profession.

We reject Crossen's argument that the prevailing ethical standards at the time were at best ambiguous about the propriety of attorney participation in the kind of "sting" operation at the center of this case. Nor do we credit Crossen's contentions that the special hearing officer was obligated to accept the testimony of Crossen's expert on legal ethics; that Crossen was improperly singled out for disciplinary action; that he was otherwise deprived of due process of law; or that the sanction of disbarment is markedly disparate from sanctions for similar conduct. We remand the case to the county court where a judgment of disbarment shall enter.

We turn now to the background of this case. Our recitation of the facts is necessarily lengthy because of the range of the respondent's claims and the severity of the sanction we impose.

" . . .

"(5) Knowingly make a false statement of law or fact.

" . . .

"(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent."

1. *Background.*[3] Crossen was admitted to the Massachusetts bar in 1977 and soon thereafter became an assistant district attorney in the Suffolk County district attorney's office, serving primarily in the organized crime division. Among his duties in the division was to supervise undercover investigations and serve as a "point person" for court-authorized wiretaps of alleged organized crime figures. In 1983, Crossen joined the newly created New England Organized Crime Drug Enforcement Task Force in the Boston office of the United States Attorney, becoming in turn chief of the General Crimes Unit and of the Criminal Division. At the United States Attorney's office, Crossen handled criminal cases, supervised undercover investigations, court-ordered wiretaps and one-party consent tape recordings, and participated in decisions to immunize witnesses. Crossen left government service in 1988 to join a large Boston law firm, starting as "counsel" and becoming a partner specializing in criminal and civil litigation.

a. *Demoulas family litigation.* As with its companion case, *Matter of Curry*, ante 503, 506 (2008) (*Curry*), this disciplinary proceeding is one more offspring of a family dispute among members of the Demoulas family, recounted at length in *Demoulas* v. *Demoulas Supermarkets, Inc.*, 424 Mass. 501, 504-509 (1997), and *Demoulas* v. *Demoulas*, 432 Mass. 43 (2000). See also *Demoulas* v. *Demoulas*, 428 Mass. 555 (1998). For a summary of the issues in these family disputes, see *Curry, supra.*

The background to this disciplinary proceeding begins in 1994, when Crossen filed an appearance for Frances Kettenbach, daughter of Telemachus Demoulas, in the shareholder derivative suit filed against Telemachus, his wife, and their children[4] by members of the George Demoulas branch of the family. See *Curry, supra* at 507. One of Crossen's first actions as counsel in that case was to file an "emergency motion" for recusal of Superior Court Judge Maria Lopez, or in the alternative, for an evidentiary hearing on the recusal motion before

[3] We summarize the facts found by the special hearing officer and adopted by the board, noting discrepancies where they occur. See *Matter of Hilson*, 448 Mass. 603, 604 (2007).

[4] Telemachus's children include Arthur T. Demoulas (Arthur T.). George Demoulas also had a son named Arthur, who is referred to in the various Demoulas opinions as Arthur S.

another judge. The essence of the emergency motion was that Judge Lopez's actions in a former case involving the Demoulas family dispute had demonstrated bias against Crossen's clients. See *Demoulas* v. *Demoulas*, 432 Mass. 43, 45 (2000). The emergency motion was denied.

The suspicion of bias on the part of Judge Lopez did not end there. In 1996, Crossen hired a private investigating firm to investigate a rumor that Judge Lopez had been seen dining with the lead counsel for the George Demoulas branch of the family at the Charles Restaurant, a business owned by Judge Lopez's husband (Charles Restaurant investigation). By late spring of 1997, when the events in this case began to unfold, Crossen was contemplating whether to file a second motion to recuse Judge Lopez from the shareholder derivative case based on the Charles Restaurant allegations. The matter was urgent. This court had upheld Judge Lopez's decision in the shareholder derivative matter, as well as her denial of the "emergency motion" to recuse, and had remanded the case to the Superior Court where Judge Lopez would preside over further proceedings.[5] See *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 503-504 (1997). Looming were accountings and a merger of assets that would deprive Telemachus's family group of much of their control of the family businesses and fortune, this despite millions of dollars in legal fees that had been paid by that group to prominent Boston law firms and attorneys.[6] The contemplated second recusal motion was an attempt to stop, or at least slow, the merger of assets and its attendant divestment of a substantial portion of Crossen's clients' assets by disqualifying Judge Lopez and, ultimately, having her previous findings and orders set aside.

We turn now to the key events in this disciplinary proceeding against Crossen.

b. *Preparations for a sham interview.* On June 8, 1997,[7] a Sunday, Crossen met with Arthur T. Demoulas (Arthur T.)

---

[5] Throughout, we shall refer to Judge Lopez's judgments in the shareholder derivative case in the trial court as the *Demoulas* decision.

[6] Crossen testified that, at a meeting of counsel for the Telemachus family defendants after the *Demoulas* decision issued, "[e]verybody was convinced that Judge Lopez was severely biased against all of our clients."

[7] Unless otherwise specified, the dates referred to throughout took place in 1997.

at the latter's request at the Demoulas corporate offices in Tewksbury. There Crossen learned for the first time that, in 1995, Arthur T. had hired attorney Kevin Curry and two investigators, Ernest Reid and Richard LaBonte, to conduct a "pretext investigation . . . to figure out who wrote the Demoulas decision."[8] Arthur T. told Crossen that Curry and LaBonte, using assumed identities, had met with a former law clerk of Judge Lopez (law clerk) in Halifax, Nova Scotia, under the pretext of interviewing the law clerk for a position as in-house counsel for a sham multinational corporation. Arthur T. reported that the law clerk claimed to have written the entire *Demoulas* decision, and that Judge Lopez had signed the decision without reading it. More significantly, Arthur T. told Crossen that the law clerk had said that Judge Lopez had told him (the law clerk) who the winners and losers, the "good guys" and the "bad guys," were going to be before the shareholder derivative suit began. Crossen dismissed as "not that big a deal" the information concerning authorship of the *Demoulas* decision, but he was troubled by the information that Judge Lopez had prejudged his clients' case.

That same day Crossen met with Arthur T. and another attorney for the defendants, Richard K. Donahue,[9] to discuss the import of the Halifax interview. Crossen testified before the special hearing officer that he considered his only options at the time to be ignoring the information, incorporating it into a motion or pleading or complaint, or investigating further to determine the truth. At the time, Crossen testified, he did not "give[ ] a whole lot of thought to the issue of the propriety" of Curry's communications with the law clerk.

Some time after the June 8 meetings, Crossen received a signed affidavit from Curry in which the latter averred that during the Halifax "interview," the law clerk on four separate occasions had disclosed Judge Lopez's predisposition against Crossen's clients; that the law clerk claimed to have written the

---

[8]We refer to the companion disciplinary case, *Matter of Curry, ante* at 503, 508-514 (2008) (*Curry*), for a recitation of the facts concerning the relevant events that preceded the events we now describe. Crossen was not involved in those earlier events with the law clerk.

[9]See *Curry, supra* at 516 n.21.

*Demoulas* decision himself; and that the law clerk had submitted a letter attesting his fitness for admission to the Massachusetts bar that was written by someone whom the law clerk did not know. See *Curry, supra* at n.19. Soon after receiving Curry's affidavit, Crossen decided to procure tape-recorded statements of the law clerk by interviewing and secretly tape recording him in a jurisdiction that permits one-party consent, which Massachusetts does not. See G. L. c. 272, § 99 (B) (4) & (C) (1).[10]

Crossen then set about to implement his plan. He directed an associate at his law firm to review the laws of Canada and a Caribbean jurisdiction (either Bermuda or the Bahamas) to determine whether one-party consent to tape recording communications was permitted in either jurisdiction. To assess Curry's credibility, Crossen also directed the associate to discover what he could about Curry. In addition, Crossen met personally with Curry to discuss the information Curry claimed he had learned from the law clerk, and what to do with it. Among other things, the two men discussed continuing the ruse and secretly tape recording the law clerk's statements in a one-party consent jurisdiction such as New York or Bermuda. At some point in early June, Crossen also discussed the surreptitious tape-recording plan with Donahue. Donahue questioned Crossen about the propriety of such an investigation; he testified before the special hearing officer that Crossen "said he was having [the matter] looked into, and that he was not concerned with it and that basically I shouldn't be."

Between June 9 and June 12, Crossen consulted about the planned subterfuge with Donahue, Curry, and others, including two private investigators who were working with Crossen on

[10]Crossen testified that he pursued the tape recording idea because he wanted to be certain of his foundation for asking the judge to recuse herself, by "determining whether Mr. Curry's report [about the meeting in Halifax] was credible." He also testified that he and Arthur T. discussed the option of filing a complaint against Judge Lopez with the Commission on Judicial Conduct, but that the client felt the better course was to raise the issue in the pending proceedings in order to cast doubt on Judge Lopez's previous rulings in the Demoulas litigation. The special hearing officer found that, in light of Arthur T.'s firm conviction that Judge Lopez was biased against him and his family, it was "impossible to believe" that Arthur T. would prefer to face Judge Lopez with a recusal motion rather than to bring the matter to the independent Commission on Judicial Conduct.

the Charles Restaurant investigation, Stewart Henry and Joseph McCain. The group decided that the law clerk would be asked to go to the Four Seasons Hotel in New York, a one-party-consent jurisdiction, for a "further interview" for an in-house counsel position with a phantom multinational reinsurance firm, British Pacific Surplus Risks, Ltd. (British Pacific). See *Curry, supra* at 512, 516-517. Unbeknownst to the law clerk, the interview would be tape recorded. The group's plan was to catch the law clerk unawares by having him repeat the assertions Curry claimed he had made in Halifax concerning Judge Lopez's predispositions about the *Demoulas* decision. At that point, Crossen would "brace,"[11] or aggressively confront, the law clerk with the tape recorded-statements in order to gain his cooperation in giving an affidavit or sworn testimony against Judge Lopez.[12]

The group decided that Reid, resuming his guise as a job consultant, see *Curry, supra* at 510-511, would contact the law clerk about interviewing with some British Pacific "decision makers." In New York LaBonte, reprising his role in Halifax as British Pacific employee Richard LaBlanc, would be one of the interviewers. See *Curry, supra* at 516. The part of "Peter O'Hara," a "principal" in British Pacific, would be played by Joseph Peter Rush, a private investigator who previously had worked as a United States Secret Service special agent-in-charge in Boston.[13] Crossen and Henry would "monitor" developments

---

[11]Joseph Peter Rush, another investigator used by Crossen, testified before the special hearing officer that he understood "brace" to be a "cop's term" meaning "to confront . . . with disparities just as you would impeach a witness." Investigator Stewart Henry equated the word "brace" with the word "toss," which he defined as "a little more aggressive than confront." Investigator Richard LaBonte testified before the special hearing officer that he understood the term "brace" to mean "a little bit more than confronting and a little bit more intimidating."

[12]Crossen had hoped to conduct the sham interview at the law offices of attorney Robert Shaw, a friend of Arthur T. Without his knowledge, Shaw's name had been bandied about in the Halifax interview as "outside counsel" to the nonexistent insurance firm, British Pacific. Shaw refused to permit the conference rooms in his law office to be used for the ruse, a fact noted by the board when it concluded that Crossen was put on notice that his conduct violated the disciplinary rules.

[13]Like LaBonte, Rush was furnished with a business card with his pseudonym and title and supposed British Pacific contact information. See *Curry, supra* at 512.

from an adjoining room.[14] A tape-recording technician would complete the New York contingent. Crossen was to be the sole decision maker on whether to "brace" the law clerk once the law clerk uttered the "magic words" concerning Judge Lopez's predisposition.

Other members of Crossen's team besides Donahue felt uncomfortable with their intended methods. During the planning process, Rush asked Crossen whether the New York interview was ethical and legal. Rush was particularly concerned to know whether it was permissible for him, as a private citizen, to conduct a sham interview and secretly make a tape recording of the interview with the law clerk, another private citizen. Crossen assured Rush that, in Rush's words, Crossen "had researched the legalities and ethics of it and that it was legal." Crossen also reassured Rush that, again in Rush's words, "it's been cleared by ethics." Rush testified that he "took that to believe [Crossen's] firm had an ethical committee, and it had been run through them and they had okayed it."[15] "In fact," the special hearing officer found, "Crossen never discussed any issue regarding the Demoulas case with [his] firm's committee on conflicts and professional responsibility." Based on Crossen's assurances that, in Rush's words, the "legal and ethical bases had been touched," Rush agreed to participate in the sham interview.

Crossen, Henry, LaBonte, and Rush decided that Rush would carry a concealed tape recorder in the pocket of a spare jacket and that Crossen and Henry would monitor the interview by silent videotape recording in the adjacent room of the suite.

c. *The sham interview in New York.* Prior to the interview, Reid delivered airplane tickets, one hundred dollars in cash, and O'Hara's name to the law clerk. When he arrived in New York,

[14]Crossen testified that he arranged to view a videotape recording of the interview without sound in an adjacent room and to refrain from making any decisions regarding the audiotape recording, in order to comply with *Miano* v. *A.C. & R. Advertising, Inc.*, 148 F.R.D. 68, 81, aff'd, 834 F. Supp. 632 (S.D. N.Y. 1993). The special hearing officer did not credit this testimony. Crossen does not press the argument on appeal.

[15]Crossen's law firm did in fact have a committee on conflicts and professional responsibility.

the law clerk was met by a chauffeur who drove him to the hotel in a Mercedes limousine.[16]

The ruse interview lasted approximately one and one-half hours. Rush, as O'Hara, began by (falsely) explaining the nature of British Pacific's reinsurance business and its opportunities for travel and interesting work.[17] Rush then explained (again falsely) that Shaw was unable to attend the interview but had been "very laudatory" about the law clerk's writing skills. He reassured the law clerk that the law clerk's speech impediment, see *Curry, supra* at 513, would not be a barrier to his employment by British Pacific because the company was most concerned with hiring "new blood" who could "write the facts in a manner which is favorable to our partnership . . . ." Rush also raised the law clerk's submission of a letter of support for his bar application written by an attorney who falsely claimed to know the law clerk. See *Curry, supra* at 515 n.19.

Conversation then turned to what Rush called the "Demopolis" case. The law clerk explained that he was able to write the decision on his own because he had sat through the trial and he and Judge Lopez had discussed the witnesses at the end of each day of the trial.[18] He also told his interlocutors that he had begun writing the decision shortly before the trial ended.[19] The law clerk's responses to questions concerning Judge Lopez's

---

[16]Prior to the June 17 interview, the law clerk had conducted some limited investigation of British Pacific. He telephoned the number in England listed on the business card of "Concave" (i.e., Curry) and asked to speak to "Concave." The person answering the telephone put him on hold and, when she returned, told the law clerk that "Concave" was not in but that the law clerk could leave a message. The law clerk checked Martindale Hubbell, a lawyer's directory, and confirmed that Robert Shaw was an attorney in New York practicing maritime law.

[17]The transcript of the New York interview, furnished as part of the record, indicates that Rush told the law clerk that "some of the risks we have out there, particularly the maritime risks are just huge and we're growing, we've been expanding into ah, ah, Europe and parts of Europe that been behind the ah, you know, the iron curtain for years and there's new opportunities out there, there's gonna be a lot of travel, but there's gonna be great opportunities."

[18]The special hearing officer found that the law clerk understood that the decision to hire him depended on his convincing "O'Hara" and "LaBlanc" that he had excellent writing skills and had written the *Demoulas* decision himself.

[19]This information was contrary to Curry's account of the Halifax interview, in which he stated that the law clerk claimed to have begun writing the deci-

alleged predisposition were decidedly more equivocal and weaker than they were alleged to have been in Halifax.[20,21]

sion soon after the trial started.

[20]The following are representative exchanges reproduced from the transcript of the New York interview:

> LAW CLERK: "She probably knew from the start who was going to win . . . from the other . . . ."
>
> RUSH: "Did she really?"
>
> LAW CLERK: "I, I dunno. I mean she had seen an earlier trial with the same . . . people. . . . I think that the evidence and the correspondence over the . . . years . . . just showed . . . who, who was telling the truth and who's lying."
>
> ". . .
>
> RUSH: "So [Judge Lopez], she had been the Judge in the first trial and she was just waiting to take a piece out of 'em in the second trial. (Laughs)"
>
> LAW CLERK: "I mean she had dealt with the same attorneys and the same witnesses over a year prior to that starting so . . . ."
>
> RUSH: "Yeah."
>
> LAW CLERK: "That was interesting."
>
> ". . .
>
> LABONTE: "And when this [trial] ends you spent 84 days. (Laugh) Listening to what was already known or felt."
>
> LAW CLERK: "Well, you know . . . ."
>
> LABONTE: "Predetermined."
>
> LAW CLERK: "I don't, I don't, I don't know if it was predetermined so . . . I'd like to think she kept some sense of, of open-mindedness."
>
> ". . .
>
> LAW CLERK: "She, she, um, probably made up her, her mind probably prior to the, to the trial starting. But, ah, as I said, I felt she kinda kept somewhat of an open mind, so . . . ."
>
> RUSH: "And, and she just told you from the get go . . . who's the good guys, who's the bad guys and allow you to write the opinion."
>
> LAW CLERK: "Yeah, yeah, and support it."

[21]Rush testified before the special hearing officer that he felt that the law

At one point during the interview, Rush took a break and went to the adjoining suite to tell Crossen and Henry that he believed the law clerk's statements to be "very weak." Crossen instructed Rush to resume the interview and attempt to "clarify the issue of" Judge Lopez's predisposition. Soon thereafter, LaBonte was summoned out of the room because Rush was afraid that he was being so persistent about the *Demoulas* decision that the law clerk would become suspicious. When La-Bonte went to the room where Crossen and Henry were viewing the videotape recording, he told them that the law clerk was stuttering badly, and that they would give the law clerk a "heart attack" if they were to "brace" him.[22] Crossen replied that they "would see." The law clerk was not "braced" that day.

d. *Preparations to confront the law clerk.* After reviewing the tape recording of the interview, Crossen reported to Arthur T. that it was a "mixed bag," and that he had not "braced" the law clerk. Upon returning to Boston, Crossen met with Henry, McCain, and Edward Barshak and Susan Hartnett, two other members of the Telemachus Demoulas family defense team who were partners at another Boston law firm, and told them about the New York interview. Once again Crossen was asked whether there was "any issue" related to contact with a judge's former law clerk. Crossen stated that he did not think so, but would look into the matter. The record does not reveal whether the defense team discussed the appropriateness of contacting a former law clerk regarding an ongoing matter in which their clients were litigants.

On June 20, Crossen asked a second associate at his firm to research whether it was proper to speak with a former law clerk

clerk was anxious to please and agree with him. The law clerk testified that, in the New York "interview," he was eager to agree with his interviewers about the issue of predisposition so that they would move on to another topic.

[22]During the New York interview, Rush told the law clerk that Labonte was questioning the law clerk about predisposition in order to ascertain whether the law clerk actually wrote the *Demoulas* decision. Rush advised the law clerk that, while in Halifax, the law clerk had said "there's certain people going in there [who] were liars and that . . . the Judge told [the law clerk] this upfront. And this is what allowed [the law clerk] to write it without the Judge having to get too much involved." Rush then said, "[m]ade sense to me I mean . . . . So that's why I guess [LaBonte has] continued to ask that question."

concerning conversations between the law clerk and the judge.[23]
The associate reported later that day that, although he had been
unable to find an explicit ban on contacts with former law
clerks, a limited privilege may prevail between judges and their
clerks, and that even absent such privilege, policy arguments
disfavored such contact. He left a number of cases on Crossen's
chair, with notes, including cases dealing with contacts with
former jurors. Crossen did not ask the associate to follow up
this initial research.

That same day, June 20, Judge Lopez ordered the long-delayed
merger of Demoulas assets to take place. An emergency meet-
ing of the Telemachus Demoulas family defense team, consist-
ing of at least twelve lawyers from leading Boston law firms,
was called for June 23 to discuss filing a recusal motion based
on the Charles Restaurant investigation. Barshak's firm had
been tasked with drafting the motion to recuse based on af-
fidavits obtained by Crossen and his investigators on the Charles
Restaurant matter. Prior to the June 23 meeting, which Arthur T.
was also expected to attend, Crossen sent a copy of the tape
recording of the New York "interview" and a transcript to Bar-
shak, who reviewed the material with two of his colleagues.

The emergency meeting focused first on the Charles River
investigation, but soon turned to the law clerk matter. Attorneys
who had not known of the investigation were apprised of it by
Arthur T., with Crossen adding further information about the
Halifax and New York interviews. Crossen also distributed
transcripts of the New York interview to the meeting's par-
ticipants. Some attorneys, including Barshak, John P. Sullivan,
Judith Dein, and Samuel Adams opined that the information
was worthless or should not be pursued further. Adams and Sul-
livan also voiced reservations about Curry's credibility based on
their prior dealings with him. According to Adams, when Dein
asked Crossen whether it was ethical to "approach a law clerk
who had been on a case you tried," Crossen replied that "they
had researched that, and, while [there were] issues that related
to approaching a juror, that prohibition did not relate to a

---

[23]Crossen did not tell the associate that Crossen was already in contact with
a judge's former law clerk concerning an ongoing matter in which he represented
some of the parties.

law clerk." Crossen told the group he thought the law clerk information was "persuasive" and should be included in the motion to recuse.

At the end of the two-and-one-half hour meeting, the group decided not to include the information obtained from the law clerk in the motion to recuse Judge Lopez. On June 25, the motion to recuse Judge Lopez was filed, based solely on the Charles Restaurant investigation. On July 21, Judge Lopez heard the motion and denied it.

Arthur T., however, told Crossen and Donahue privately that he did not want to let the law clerk matter drop. Crossen suggested that a logical step would be to confront the law clerk and, in the special hearing officer's words, "ask him to tell the truth about what had happened." Donahue met separately with Arthur T. and told him that Barshak would leave the defense team if any of the law clerk material was used. Neither Crossen nor Donahue told Barshak or Adams about their subsequent dealings with the law clerk.

On July 24, Reid made reservations for "Peter O'Hara" at the Four Seasons Hotel in Boston for an August 2 meeting with the law clerk. On August 1, Crossen, Curry, Donahue, Arthur T., Rush, Reid, McCain, and Henry met at the offices of Crossen's law firm to discuss strategy for this upcoming meeting. The participants knew that Reid had told the law clerk that this meeting would be his final "interview" for the British Pacific job.[24] They decided on a free-form interview that would (1) apprise the law clerk of the ruse, (2) serve to determine whether the law clerk would verify the statements attributed to him in Halifax and parts of his New York interview, and (3) gauge the law clerk's willingness to cooperate with defendants' counsel by confirming the statements in an affidavit or otherwise. The group also decided to have the law clerk followed after the meeting in case the law clerk attempted to contact Judge Lopez

[24]After the New York meeting, the law clerk had again made minimal attempts to verify the existence of British Pacific, but in the end determined that the job offer was legitimate. He was "very excited" to receive Reid's call, which promised that the meeting at the Four Seasons Hotel in Boston would be "the big pitch." He bought a new suit and tie for the occasion, and testified that he and his wife were "overwhelmed."

or the Demoulas plaintiffs' counsel. McCain and his associates were given the job of surveillance.

e. *Confrontation of the law clerk.* Soon after the law clerk arrived at the appointed suite in the Four Seasons Hotel in Boston, Rush told the law clerk to listen carefully because he would hear something that would send him on the "roller coaster of [his] life" and elicit a range of emotions and "concern for the future." But, Rush added, "if you cooperate with us, it will be okay." Rush then laid out for the dumbfounded law clerk the details of the British Pacific ruse. The law clerk almost immediately connected the dupery with the *Demoulas* decision and with Crossen, whom he had earlier seen in the lobby. Rush explained to the law clerk, who by this time was enraged, who his clients were.

Crossen then entered the room. He and the law clerk had words about the motion to recuse, and the ruse. The law clerk yelled at Crossen for doing nothing to stop the chicanery, and Crossen replied that, while he was not entirely comfortable with the tape recording, he had "inherited the ruse" and it was not something he could stop. He told the law clerk that the present meeting was not being tape recorded because this was not legal in Massachusetts, but that Halifax and New York were one-party consent jurisdictions. Crossen did nothing to dispel the impression conveyed by Rush that tape recordings had been made of both the Halifax and New York sham interviews.[25] The law clerk angrily denied that he had written the entire *Demoulas* decision and claimed to have been "puffing" when he previously had proclaimed otherwise. He also refused to answer repeated questions about Judge Lopez's predisposition, saying that the *Demoulas* defendants had received a fair trial.

Crossen told the law clerk that he could not control what his clients would do with the information they had; that if the law clerk did not "help him" there would be a "missile" fired "that's out of my control and it's off, and I don't know where it goes and what it ends up doing"; that he, Crossen, needed a

---

[25]The special hearing officer made no finding regarding whether the Halifax interview was tape recorded. She indicated, however, that she believed LaBonte's testimony that the interview was not tape recorded. See *Curry, supra* at 512 n.15.

"candid conversation" with the law clerk "about what really happened here"; and other statements that the special hearing officer, in our view, characterized correctly as threats. Donahue told the law clerk that, if he did not cooperate with them, the false letter submitted with his bar application would be made public.[26]

The law clerk asked numerous times to hear the "tapes" or read transcripts of the Halifax and New York tape recordings himself, but Crossen refused to permit this. After some forty minutes, the law clerk got up to leave. Crossen told the law clerk to retain a lawyer, talk the matter over with his wife, and to telephone either Donahue or Crossen on Monday.

f. *Further threats and surveillance.* The law clerk was so visibly shaken and upset when he left the meeting that McCain, who was following him, thought he might be suicidal. The law clerk went to the offices of his employer where named law partner Robert Sullivan found him alone in a conference room, crying. The law clerk told Sullivan what happened. Sullivan promptly contacted attorney Harry Manion, who agreed to represent the law clerk. The law clerk then went home to see his wife. A delivery person appeared at their door with a pizza the couple had not ordered. The law clerk noticed a man with a mobile telephone sitting on a bench across from his apartment house, the same man who had been there when the law clerk had left for work in the morning.

On Manion's advice, the law clerk began drafting an affidavit. On August 4, the law clerk met with agents of the Federal Bureau of Investigation (FBI), a meeting Manion had arranged. The law clerk's affidavit and a supplemental affidavit were given to the FBI and also provided to Judge Lopez and her attorney. The Federal agents told the law clerk that his affidavit

---

[26]Furnishing false information in connection with an application for admission to the bar is grounds for discipline in Massachusetts. See, e.g., *Matter of McGarvey*, 15 Mass. Att'y Discipline Rep. 390, 391 (1999) (two-month suspension for falsely answering "no" when asked whether attorney had been disciplined as a member of any profession); *Matter of Ruzzo*, 10 Mass. Att'y Discipline Rep. 233, 233 (1994) (one-month suspension for leaving question blank and thereby failing to reveal that attorney had previously applied to take bar examination in another State, and for falsely answering "no" when asked whether he had been party in legal proceedings).

did not provide substantial evidence of what had occurred and urged him to agree to wear a recording device to capture Crossen's statements that he had the "tapes," as well as Crossen's threats to the law clerk. After some hesitation, the law clerk agreed to do so.

On August 20, after exchanging several telephone calls, the law clerk and Crossen met at the latter's office. There they had a lengthy conversation, which was secretly tape recorded by the law clerk for the FBI. The law clerk repeatedly asked Crossen whether he could listen to the "tapes," claiming that he did not recall some of the statements attributed to him in the sham interviews, and that listening to the tape recordings would help him determine his next steps. Crossen adamantly refused, telling him "that is just not going to happen." Crossen did tell the law clerk that the information about Judge Lopez's predisposition would "come out one way or the other," and he again urged the law clerk to have a "candid conversation" with him about Judge Lopez's predisposition. Crossen told the law clerk that, while he (Crossen) could not guarantee that the false bar application letter would not be made public by other counsel, he would do his best to see that the letter was not introduced in evidence or to minimize the damage if it were. The special hearing officer found that the law clerk understood from Crossen's comments that "if he helped Crossen, Crossen would not bring up the bar letter."

The special hearing officer also determined that the "candid conversation" Crossen was urging meant a conversation in which the law clerk stated that Judge Lopez was predisposed against Crossen's clients: no other statement from the law clerk would have satisfied Crossen.[27] The meeting concluded on a note of urgency. While the special hearing officer did not summarize the remainder of the conversation, the transcript entered in evidence establishes that Crossen told the law clerk that a hearing on the interlocutory appeal of Judge Lopez's denial of the Charles Restaurant recusal motion was scheduled to take place in five days before a single justice of the Appeals Court.

---

[27]Toward the end of the meeting, Crossen told the law clerk: "There is no circumstance[ ] under which you are going to hear those tapes before you have this candid conversation with us."

As a result, he said, he and the client were "making strategic decisions day to day." Crossen stated that "the client knows the information is there" and might direct the attorneys to use the information at or before the Appeals Court hearing.[28] Crossen told the law clerk to get back to him within twenty-four hours.

The following day, Crossen and the law clerk spoke by telephone. Again, the law clerk secretly tape recorded the conversation at the request of the FBI. The law clerk and Crossen repeated their respective, contradictory demands about the "tapes." After the law clerk again refused to help Crossen without hearing the tape recordings, Crossen told the law clerk that "you're going to find yourself in a situation that is gonna be very troublesome to you and the lawyers that recommended you" for admission to the bar. He urged the law clerk to hire independent counsel, saying: "It's, it's gonna be a very harmful road for you, you [ought to] talk to somebody before this hits." After more wrangling about the tape recordings, Crossen offered to let the law clerk listen to a "small segment" to satisfy himself that the tape recordings existed. The law clerk agreed to the proposal. They agreed to meet the next day at Crossen's office. Prior to the meeting, Crossen and Donahue decided to play the portion of the New York tape recording dealing with the false bar letter because, in the words of the special hearing officer, "they knew that it was [the law clerk's] Achilles heel, and they intended to use that to pressure and intimidate [the law clerk] into cooperating with them by giving them an affidavit on Judge Lopez's alleged predisposition in the [s]hareholder [d]erivative [c]ase."[29]

On August 22, a Friday, the law clerk met with Crossen, Donahue, and McCain at Crossen's office. Crossen played a portion of the tape recording in which the law clerk and Rush discussed the false letter recommending the law clerk for admis-

---

[28]Crossen knew this to be false. See notes 30 and 40, *infra*.

[29]The special hearing officer did not credit Crossen's and Donahue's testimony that Arthur T. selected the snippet of tape recording to be played to the law clerk. Nor did she credit Crossen's testimony that the segment played to the law clerk was chosen because it did not involve a matter of substance. The segment, of course, involved a matter of substance to the law clerk. Moreover, the special hearing officer noted that many other nonsubstantive portions of the tape recording could have been played to the law clerk if the attorneys intended merely to shield him from matters of substance.

sion to the bar. The law clerk stated: "You've got tapes." Crossen replied, "We have tapes."

Crossen told the law clerk that the tape recording would be played in the court room on the "best equipment," to override its poor quality. He told the law clerk that "[w]e're on a fast moving train here" and that "the train is ready to pull out of the station." He reiterated the need to have a "full blown discussion" with the law clerk "as soon as possible" about Judge Lopez's predisposition. They arranged to meet again early the following Monday.[30]

On Monday, August 25, rather than meeting Crossen, the law clerk left a voice mail message telling Crossen that he (the law clerk) was required to be out of town. McCain's investigators, however, later informed Crossen that the law clerk was actually in Boston that day. On learning the news, Crossen telephoned the law clerk's home.

The law clerk returned Crossen's telephone call the following day. Crossen told the law clerk he was "a little bit angry" to learn that the law clerk had been at home on the day of the canceled meeting. The law clerk accused Crossen of having him followed; Crossen denied the charge.[31] Crossen then told the law clerk that "if we don't get something done before" Thursday, he was not "optimistic" that the client "won't insist upon me dropping the hammer, if you will." Crossen suggested that they meet early the next evening because he could no longer keep his client "[reined] in."

On August 28, the law clerk left Crossen a voice mail mes-

[30]The special hearing officer found that, not only did Crossen and Donahue know that they had no intention of using the tape recordings or Curry's or LaBonte's affidavits at the hearing in the Appeals Court, but Crossen also knew that Barshak would leave the defense team if the tape recordings were used.

[31]On at least five separate occasions in August, 1997, the law clerk and his wife were watched and photographed by McCain's investigators. Apparently to provide security to the law clerk and his wife, at different times the law clerk's parents moved into the law clerk's condominium, agents of the Federal Bureau of Investigation (FBI) moved the law clerk to a hotel in Natick, and the law clerk's wife went to stay with her parents. The special hearing officer concluded that Crossen participated in arrangements for the surveillance of the law clerk after the August 20 meeting and that his testimony before her to the contrary was false. The board declined to adopt that specific finding, for lack of supporting subsidiary findings. It plays no part in our considerations.

sage saying he was going out of town and would contact Crossen when he returned. On August 29, the FBI served grand jury subpoenas on McCain, LaBonte, Rush, and Reid. On that day, Crossen learned that the FBI also was investigating his contacts with the law clerk. The law clerk and Manion held a press conference about the matter on September 17, 1997.

2. *Bar disciplinary proceedings.* In January, 2002, bar counsel filed a three-count petition for discipline against Crossen, Curry, and Donahue in connection with the law clerk matter. Among other things, the petition alleged that Crossen: "plann[ed], execut[ed], and participat[ed] in a scheme to induce a former law clerk to travel to New York under the pretext of a job interview in order to tape record a conversation with him without his knowledge or consent," in violation of Canon 1, DR 1-102 (A) (2) and (4)-(6), and Canon 7, DR 7-102 (A) (5) and (7); "plann[ed], execut[ed], and participat[ed] in a scheme to induce a former law clerk to make damaging or compromising statements about himself or about the judge for whom he clerked with the false inducement of a lucrative employment . . . in order to force the judge's recusal or undermine her decisions in an ongoing case," in violation of Canon 1, DR 1-102 (A) (2) and (4)-(6) and Canon 7, DR 7-102 (A) (5) and (7); "communicat[ed] falsely to [the law clerk] that [he] had in [his] possession a tape of the Halifax meeting," in violation of Canon 1, DR 1-102 (A) (4) and (6), and Canon 7, DR 7-102 (A) (5) and (7); "attempt[ed] to get [the law clerk] to state under oath that Judge Lopez had predetermined the outcome of the stockholder derivative trial and had told him from the outset how the case was to be decided under the threat of disclosing the supposed contents of the tape and embarrassing and compromising statements [the law clerk] made at the pretext job interviews," in violation of Canon 1, DR 1-102 (A) (4)-(6), and Canon 7, DR 7-102 (A) (5) and (7); "attempt[ed] to get [the law clerk] to state under oath that Judge Lopez had predetermined the outcome of the stockholder derivative trial and had told him from the outset how the case was to be decided under the threat of disclosing that he and his friends had submitted with his petition for admission to the bar a recommendation from a lawyer whom he personally did not know," in violation of Canon 1, DR 1-102 (A) (4)-(6), and Canon 7,

DR 7-102 (A) (5) and (7); "[had the law clerk] and his wife put under surveillance and [had the law clerk's] personal circumstances investigated," in violation of Canon 1, DR 1-102 (A) (5) and (6); and "[denied] to [the law clerk] that [the law clerk] was under surveillance," in violation of Canon 1, DR 7-102 (A) (4) and (6).[32]

Pursuant to S.J.C. Rule 4:01, § 3 (2), as amended, 430 Mass. 1314 (1999), and Rule 3.19 (a) of the Rules of the Board of Bar Overseers (2007, the board designated a special hearing officer to take evidence and make findings of fact, conclusions, and recommendations. Her report issued on May 11, 2005. By a vote of nine to two, the board adopted the special hearing officer's recommendation that Crossen be disbarred.

3. *Standard of review.* Our standard of review in bar discipline cases is well established, and is set out in *Curry, supra* at 519. We apply this settled standard to Crossen's threefold appeal. He contends, first, that judged by professional standards as they existed in 1997, his actions were not only proper but "required" in order to represent his clients zealously and to protect the integrity of the judicial system. He was acting, he claims, as would any "courageous advoca[te]." Second, he argues that the procedures followed by the special hearing officer deprived him of due process. Last, he claims that the sanction of disbarment is markedly harsher than sanctions imposed for similar conduct. We consider each argument in turn.

4. *Violations of the Rules of Professional Responsibility.*

a. *Contemporary ethical standards.* Crossen does not argue, nor could he, that the disciplinary rules forbidding a lawyer from engaging in dishonest or deceitful behavior, through his own professional conduct or through an emissary, are unclear or ambiguous. See DR 1-102 (A) (2) and (4) and DR 7-102 (A) (5) and (7). To the contrary, the disciplinary rules are written in terms that any attorney bound by them should readily understand. See *Matter of the Discipline of an Attorney*, 442 Mass. 660, 669 (2004), quoting *Matter of Keiler*, 380 A.2d 119, 126 (D.C. 1977) (because disciplinary rules are written "by and for law-

---

[32]The then applicable disciplinary rules have been amended and superseded. See *Curry, supra* at 512 n.23.

yers," they "need not meet the precise standards of clarity that might be required of rules of conduct for laymen").

Nor does he argue as a general matter that his conduct in the law clerk matter would be appropriate professional conduct in all circumstances. Rather, Crossen argues that the professional norms prevalent in 1997 obligated him to vindicate his clients' interests by investigating allegations of judicial misconduct, and, further, that he reasonably believed at the time that as a private attorney he was empowered to use the same investigative techniques that would have been available to government attorneys, including the ploy of a "pretextual" interview where ascertaining the truth by less covert means likely would not be possible. We are not persuaded.

(i) *The duty to investigate.* Crossen's first point strikes at a straw man. Contrary to his assertions, the special hearing officer did *not* conclude that in 1997 Crossen was "ethically prohibited" from investigating the allegations against Judge Lopez as the basis for a potential recusal motion. Rather, she found that Crossen could have pursued, and was aware that he could have pursued, a number of legitimate avenues to investigate the claims against Judge Lopez.[33] Given these unquestionably legitimate options, she concluded, Crossen's choice to conduct his investigation by means of a sham interview and other actions designed to trick or coerce the law clerk into making sworn statements "he otherwise would not have made" far exceeded any acceptable norms of professional conduct, as Crossen's conduct shows that he himself was aware. We agree.

The cases on which Crossen relies to defend his duty to investigate allegations of judicial misconduct avail him little. In *Moffat* v. *Gilmore*, 113 F.3d 698, 702-703 (7th Cir. 1997), for example, a prisoner in a habeas petition asserted that the pres-

[33]The special hearing officer noted that Crossen could have pursued the allegations against Judge Lopez by filing a complaint with the Commission on Judicial Conduct, petitioning the Chief Justice of the Superior Court, or approaching the law clerk in a straightforward manner regarding the statements he allegedly made in Halifax. At the hearing before her, Crossen acknowledged that he could have filed a complaint with the Commission on Judicial Conduct rather than pursue a motion to recuse, but he testified that he did not know he could have petitioned the Chief Justice of the Superior Court for an investigation of the allegations. The special hearing officer did not credit this testimony.

ence of the judge's son at the prisoner's criminal trial and a subsequent conversation between the judge and his son concerning the trial was sufficient to prove that the judge was prejudiced against him. Dismissing the claim as without merit, the court held that the defendant's attorney, not the court, bears the burden of conducting a thorough investigation into allegations of judicial misconduct. *Id.* at 703. The case says nothing about the methods used by an attorney to investigate such allegations. In *In re Order to Show Cause*, 741 F. Supp. 1379, 1383 (N.D. Cal. 1990), the court determined that attorneys had acted reasonably in hiring an investigator to interview individuals concerning the allegations of judicial misconduct that formed the basis of their motion to recuse. Although the allegations later proved false, the court emphasized that the attorneys did not act recklessly or with gross negligence in including them in their pleadings. Of relevance here, the court found that the attorneys' conduct did not involve "intentional conduct, such as a knowing falsehood, a misrepresentation, or other willful misconduct." *Id.* at 1383.

In *United States* v. *Cooper*, 872 F.2d 1, 3-4 (1st Cir. 1989), the court held that a judge erred in ruling that a criminal defense attorney had violated Rhode Island's Code of Professional Conduct in filing his own affidavit supporting a motion to recuse on grounds of judicial prejudice where there was insufficient evidence of the attorney's lack of good faith in moving to recuse. The court noted, among other things, that the attorney's sworn averment of good faith was uncontradicted, *id.* at 5, that the trial judge had expressed a "strong reaction" to the attorney in a related opinion, and that "spirited advocacy" is required in defending one's client from criminal charges. *Id.* at 4. At most, these cases confirm an attorney's obligation to investigate allegations of judicial misconduct in the course of the attorney's zealous representation of the client, a point not in contention. They say nothing about the ethical propriety of the *methods* that Crossen employed and directed,[34] which form the basis of the specific disciplinary charges against him. We turn now to this issue.

---

[34]Crossen's suggestion that the court in *United States* v. *Cooper*, 872 F.2d 1, 3-4 (1st Cir. 1989), condoned the attorney's use of secret video tape recording and misrepresentation in the underlying criminal case is without

(ii) *Use of a sham interview.* The board properly determined that Crossen's participation in the New York interview, including the surreptitious tape recording, violated Canon 1, DR 1-102 (A) (2) and (4)-(6), and Canon 7, DR 7-102 (A) (5) and (7). That the New York interview involved "dishonesty, fraud, deceit, or misrepresentation," Canon 1, DR 1-102 (A) (4), and "false" statements and "fraudulent" conduct, Canon 7, DR 7-102 (A) (5) and (7), cannot seriously be doubted. From beginning to end, the New York interview was a sham. Crossen devised and orchestrated that sham. He directed Rush and LaBonte, as "O'Hara" and "LaBlanc," to feed the law clerk enticing, false information in the pressured context of a "job interview," in the hopes of lulling the law clerk into making damaging and compromising statements about Judge Lopez and about himself.[35] In the words of the special hearing officer, throughout the false interview Crossen and his colleagues worked "long and hard . . . to maneuver [the law clerk] into confirming their preferred version of events surrounding Judge Lopez's decision."

Far less baroque falsehoods have been sanctioned as violating an attorney's obligation to eschew fraud, dishonesty, and deceit in professional dealings. See, e.g., *Matter of Cobb*, 445 Mass. 452, 461 (2005) (violation of DR 1-102 [A] [4]; misrepresentation to clients that sanctions had been assessed against them when in fact attorney had been sanctioned personally); *Matter of O'Sullivan*, 16 Mass. Att'y Discipline Rep. 332, 332-335 (2000) (violations of DR 1-102 [A] [4]; false statements to client that lawyer had appeared at court numerous times on client's behalf, failure to disclose that attorney's errors caused delay, failure to notify clients in timely manner that closing on property had occurred; filing of falsified documents in court); *Matter of Marshall*, 16 Mass. Att'y Discipline Rep. 299, 299-301 (2000) (violations of DR 1-102 [A] [4]; intentional misrepresentations to clients regarding status of matters and failure to respond to requests for file); *Matter of Sprei*, 10 Mass. Att'y Discipline Rep. 246,

---

foundation. Such conduct was not at issue in that case.

[35]Indeed, after Rush reported that the interview was yielding only "weak" results, Crossen directed Rush to return to the interview room and press harder for incriminating information. At Rush's suggestion, Crossen pulled LaBonte from the interview so that LaBonte would not inadvertently expose the subterfuge.

248-249 (1994) (violations of DR 1-102 [A] [4]; knowing misrepresentations to clients about status of claim; submission to bar counsel of fabricated letter; false statements to bar counsel under oath). See also *Matter of Thurston*, 13 Mass. Att'y Discipline Rep. 776, 790-791 (1997) (violation of DR 7-102 [A] [7]; assisting one shareholder in closely held corporation in stripping corporation of all assets without informing other shareholder); *Matter of Hayeck*, 13 Mass. Att'y Discipline Rep. 252, 252-253 (1997) (violation of DR 1-102 [A] [4]; impersonation of police officer while providing private security services); *Matter of Joyce*, 13 Mass. Att'y Discipline Rep. 302, 304 (1997) (violation of DR 1-102 [A] [4]; false statements to adversary regarding receipt of funds from client); *Matter of Tierney*, 13 Mass. Att'y Discipline Rep. 768, 769-770 (1997) (violation of DR 7-102 [A] [5]; preparing and delivering to clients purported court decree that attorney had fabricated). In short, "deceit . . . violates a lawyer's ethical duties." *Brown* v. *Gerstein*, 17 Mass. App. Ct. 558, 571 n.22 (1984).

The board also correctly concluded that the surreptitious tape recording of the New York interview violated DR 1-102 (A) (4) and DR 7-102 (A) (5). Crossen is correct that no legal barrier prevented him from secretly tape recording the law clerk's conversation in New York. However, when Crossen orchestrated the surreptitious tape recording in 1997, there was long-standing authority that lawyers violate the ethical rules when they tape record a person without his consent, even if the recording is legal. ABA Formal Op. 337 (1974).[36] In any event, we will not detach the legal act of one-party tape recording in New York

---

[36]Current opinion is more lenient, finding such tape recording ethical so long as it is not accompanied by other misconduct. See, e.g., ABA Formal Op. 01-422 (2001) (concluding that lawyers may conduct secret tape recordings unless it would be illegal or "where it is accompanied by other circumstances that make it unethical"); 2 Restatement (Third) of the Law Governing Lawyers § 106 comment b, at 142 (2000). Even so, the board concluded that unacceptable "other circumstances" existed in the perpetration of the sham job ruse, and thus the surreptitious tape recording violated the rules. See *Iowa Supreme Court Bd. of Professional Ethics & Conduct* v. *Plumb*, 546 N.W.2d 215, 217 (Iowa 1996) ("It is not the use of recording devices, but the employment of artifice or pretense, that truly poses a threat to the trust which is the bedrock of our professional relationships"). The record, as we have shown, is replete with substantial evidence of "other circumstances" placing the New York tape recording in ethically forbidden territory.

from the web of knowing and deliberate misstatements and falsehoods in which it was integrally embedded in this case. See *Matter of the Discipline of an Attorney*, 392 Mass. 827, 837 (1984). The legality of the tape recording does not mask its improper purpose. Where the surreptitious tape recording of the law clerk was in furtherance of an effort to coerce or even manufacture sworn testimony against a judge in a pending matter, Crossen's tape recording of the sham interview not only violated his obligations to eschew misstatement, deceit, and falsehood in his professional dealings, but also manifestly worked to the prejudice of the administration of justice and impugned his own bona fides as an attorney.[37]

Crossen's subsequent attempts to threaten the law clerk into making statements, under oath, that would discredit a Superior Court judge in an ongoing matter in which Crossen's own clients were involved also sought to undermine the integrity of a judicial proceeding and thus were "prejudicial to the administration of justice," in violation of DR 1-102 (A) (5), and adversely reflected on his fitness to practice law, in violation of DR 1-102 (A) (6). As the special hearing officer determined, "the very purpose of dangling the job before [the law clerk] was to trick him" into making statements he otherwise would not have made. "This, after all, was why [Crossen and the others] could not ask him their questions directly and honestly." We have no doubt that, at the time he embellished the job ruse, Crossen, an experienced attorney, knew that the communications about deliberative processes that flow between judge and law clerk were confidential and an important aspect of the administration of justice. Cf. *United States* v. *Nixon*, 418 U.S. 683, 708 (1974) ("claim of confi-

---

[37]The issue of the tape recordings arose previously in *Demoulas* v. *Demoulas*, 432 Mass. 43, 54 (2000). There we noted that, although the defendants claimed to have a tape recording or tape recordings of the interviews with the law clerk in New York and possibly Halifax, they had not provided either copies of the tape recordings or transcripts of them to support the allegations in the Curry and LaBonte affidavits. We also noted that, during oral argument, counsel for the defendants, the Telemachus Demoulas children, "notably failed to inform this court whether any of his clients, anyone in his law firm, or any predecessor counsel for his clients possess copies of any transcripts." *Id.* at 54 n.8. Although the counsel we referred to was not Crossen, some of the other defense counsel, including Donahue, had worked on the shareholder derivative case and had seen copies of the New York transcript.

dentiality in judicial deliberations" is akin to presidential privilege, the purpose of which is to permit presidents "to explore alternatives in the process of . . . making decisions and to do so in a way many would be unwilling to express except privately"); Comment, The Law Clerk's Duty of Confidentiality, 129 U. Pa. L. Rev. 1230, 1236-1237 (1981) (discussing survey of Federal and State judges and concluding that confidentiality of inner workings of court must be preserved in order to foster frank and open discussions between judges and clerks, which promote more effective decision-making). It could not have come as a surprise to Crossen that attempting to uncover such confidential communications through trickery and deception was improper, especially where the matter was ongoing and was undertaken at the request of a participant in the litigation.[38] Cf. *Glenn* v. *Aiken*, 409 Mass. 699, 703-704 (1991) ("Probing the mental processes of a trial judge, that are not apparent on the record of the trial proceeding, is not permissible"). We are also "left to wonder," as was the board, why Crossen would undertake such risky actions without examining "whether [the law clerk's] statements about Judge Lopez actually described cognizable evidence of judicial misconduct or a disqualifying bias." Crossen had no reason to believe that Judge Lopez acquired information or opinions about the Telemachus Demoulas defendants or any other witnesses from an "extrajudicial source" that would constitute bias. See *Liteky* v. *United States*, 510 U.S. 540, 551 (1994) ("[N]ot subject to deprecatory characterization as 'bias' or 'prejudice' are opinions held by judges as a result of what they learned in earlier proceedings. It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant"); *Haddad* v. *Gonzalez*, 410 Mass. 855, 863 (1991) (judge's opinion of litigant acquired from previous experience in judicial role and not from

---

[38]There is a sharp distinction between attempts to pierce the confidential discussions among judges and their law clerks about cases long resolved, and attempts to do so in order to influence the outcome of ongoing litigation at the behest of a client who is a litigant in the case. Cf. J. Toobin, The Nine: Inside the Secret World of the Supreme Court (2007); E. Lazarus, Closed Chambers: The First Eyewitness Account of the Epic Struggles Inside the Supreme Court (1998); B. Woodward & S. Armstrong, The Brethren: Inside the Supreme Court (1979).

"extrajudicial source" not ground for recusal). The board did not err in determining that Crossen's attempts to pry into Judge Lopez's decision-making processes in an ongoing matter at the behest of one of the parties to the litigation violated the disciplinary rules.

To be sure, Crossen did not initiate the ruse. Crossen, however, voluntarily chose to supplant Curry as the mastermind behind all of the post-Halifax trickery, whether committed by himself or his agents. For this, he is directly in breach of the disciplinary rules. See, e.g., *Miano v. A.C. & R. Advertising, Inc.*, 148 F.R.D. 68, 81, adopted by 834 F. Supp. 632 (S.D.N.Y. 1993) (lawyer's client is "another" for purposes of DR 1-102 [A] [2] prohibition against violating disciplinary rules through "another"). See also Massachusetts Bar Association Committee on Professional Ethics, Opinion No. 82-8 (1982) (lawyer who developed settlement position with his client should dissuade that client from presenting offer to opposing party without consent of opposing party's attorney, because lawyer would not be permitted to do so himself). A lawyer's obligations of good faith to the tribunal and to others would mean little if the lawyer could use surrogates to achieve by deceit and falsehood that which he himself could not do. *Miano v. A.C. & R. Advertising, Inc.*, *supra*.

(iii) *Threats and surveillance.* The board concluded that Crossen violated Canon 1, DR 1-102 (A) (4)-(6), and Canon 7, DR 7-102 (A) (5) and (7), when he threatened that, unless the law clerk stated under oath that Judge Lopez was biased against the Telemachus Demoulas family in the shareholder derivative suit, he, Crossen, would disclose the "embarrassing or compromising" statements the law clerk made during the sham job interviews, including the information that the law clerk, in connection with his bar application, had submitted a letter of recommendation from a person whom he did not know. The board also concluded that Crossen violated the same disciplinary rules, with the exception of DR 1-102 (A) (5), when he deliberately misrepresented to the law clerk that there existed a tape recording of the Halifax meeting. These conclusions find ample support in the record.

Even before he initiated the New York interview, Crossen and Arthur T. were convinced that Judge Lopez was biased. When the law clerk's equivocal statements in New York did not confirm

their conclusions about Judge Lopez, they did not reexamine their own assumptions but instead tried to browbeat the law clerk into confirming in sworn testimony their own suspicions. Crossen took the initiative in this intimidation. His conduct at the August 2 meeting with the law clerk, and during the ensuing conversations and meetings, was threatening and deceptive in myriad ways. Crossen threatened to release the tape recordings, telling the law clerk a "missile would be fired" if he did so. He deliberately misrepresented that public disclosure of the tape recordings was imminent, telling the law clerk, for instance, that the "fast-moving train" of exposure was "ready to pull out of the station" and that "the client is not gonna be patient any longer, frankly." Crossen played for the law clerk the precise portion of the New York tape recording, concerning talk of the bar application, that he knew would frighten him. He also threatened to release the bar letter, suggesting that its release would harm not only the law clerk's legal career but also that of the other lawyers involved, to whom Crossen referred by name. Crossen's message was clear: the law clerk would suffer disastrous consequences if he did not give Crossen what Crossen wanted — a "candid conversation" to the effect that Judge Lopez was biased against his clients. The special hearing officer characterized Crossen's conduct as "border[ing] on outright extortion." We do not regard her description as overstated.

Again, we consider Crossen's available choices. When the New York interview did not yield the results Crossen sought, Crossen did not lay the matter to rest. He did not confront Curry — whom he was advised by at least three highly regarded cocounsel to view with caution — with exaggerating what the law clerk said in Halifax. Rather, Crossen sought to obtain the results his client wanted by offering the law clerk a stark quid pro quo: an implicit bargain not to make public the law clerk's bar application if the law clerk offered sworn testimony that Judge Lopez had prejudged the Demoulas defendants' case.[39] To further pressure the law clerk, the quid pro quo was presented under a deadline that did not exist.[40] This conduct goes far

---

[39]Crossen and his client presumably were aware that any successful effort to impugn Judge Lopez's integrity would be widely publicized by the media, which had closely covered the Demoulas family's internecine warfare.

[40]The special hearing officer found that Crossen and Donahue knew that

beyond what a reasonable attorney zealously representing his client would consider either proper investigation of the facts or permissible hard-nosed bargaining. Crossen's most coercive actions occurred *after* the sham interview yielded equivocal results and *after* he was warned about Curry's credibility. His threatening conduct plainly prejudiced the administration of justice. See *Cincinnati Bar Ass'n* v. *Statzer*, 101 Ohio St. 3d 14, 15-16 (2003) (concluding attorney violated DR 1-102 [A] [4] when, at deposition of former legal assistant, she conspicuously displayed and suggestively labeled audio tape recordings in order to mislead assistant that tape recordings contained conversations that could impeach and personally embarrass assistant).

With regard to surveillance, there was substantial evidence for the board to conclude that Crossen intentionally lied to the law clerk when he denied any involvement in or awareness of surveillance of the law clerk in late August. We agree with the board that this misrepresentation is of a piece with his other misstatements and falsehoods in violating DR 1-102 (A) (4) and (6).

(iv) *Zealous representation.* Before turning to Crossen's contentions concerning the permissible scope of investigation for private and public attorneys, we comment further on Crossen's argument, noted above, that the ethical rules under which these disciplinary proceedings were brought were "murky at best," and that in the circumstances he did nothing more than to provide zealous representation according to contemporary standards.

We begin with the elementary observation that "an attorney is not free to [do] anything and everything imaginable . . . under the pretext of protecting his client's right to a fair trial and fair representation." *United States* v. *Cooper*, 812 F. 2d 1, 3 (1st Cir. 1989). "[A]n attorney's ethical duty to advance the interest of his client is limited by an equally solemn duty to comply with the law and standards of professional conduct . . . ." *Nix* v. *Whiteside*, 475 U.S. 157, 168 (1986). "The li-

they had no intention of using the tape recordings or Curry's or LaBonte's affidavits at the hearing in the Appeals Court. See note 30, *supra.* The material concerning the law clerk's bar application was not part of the record on appeal and could not have been used in the hearing scheduled in the Appeals Court within days of this conversation. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975), and Mass. R. A. P. 16 (b), as appearing in 411 Mass. 1602 (1992).

cense granted by the court requires members of the bar to conduct themselves in a manner compatible with the role of courts in the administration of justice." *Matter of Snyder*, 472 U.S. 634, 644-645 (1985). "Where [the duty to uphold the integrity of the justice system] is in seeming conflict with the client's interest in zealous representation, the latter's interest must yield. Were we to condone any action to the contrary, the integrity of the judicial process would be vitiated." *Matter of Neitlich*, 413 Mass. 416, 423 (1992). The duty of zealous advocacy does not extend to engaging in conduct intended to harm the orderly administration of justice, or the public's perception of unbiased adjudication. A hunch about judicial misconduct does not justify a reckless and unexamined pursuit of that hunch. Even if, as Crossen maintains, he was only following Arthur T.'s orders in continuing the law clerk investigation, Crossen had an obligation to the principles of justice to keep the investigation within ethical bounds, even at the risk of losing the client.

Crossen should have understood as much. Several of his co-counsel expressed reservations or raised questions about the propriety of going forward in New York, and sought assurances from Crossen that, based on his research and experience, the scheme was legal. Rush, the investigator, sought assurances from Crossen that the New York plan was legal and ethical. These concerns, and Crossen's and others' doubts about Curry, should have alerted Crossen, at the very least, of the need to investigate thoroughly the ethical issues surrounding his proposed conduct. But he did not seek ethical guidance from inside or outside his law firm. He failed, in the board's words, to undertake "any comprehensive legal research, any meaningful investigation, or any questioning of the investigators involved in the Halifax interview" before proceeding with the New York interview and subsequent activities.

Crossen, moreover, did more than display a lack of curiosity about the propriety of his behavior. He deliberately misled members of the Telemachus Demoulas defense team about his inquiries into the matter. He lied to Rush that he had vetted his plan with his law firm's ethics committee. He reassured Donahue and Dein that he had thoroughly researched the ethical issues, when in fact he had not. As the board noted, Crossen also "shielded [his] conduct from scrutiny and contrary advice by keeping co-

counsel [Barshak, Adams, Sullivan] in the dark about [his] intentions and plans" because he knew of or feared their disapproval. In short, Crossen studiously kept himself unenlightened about the ethical propriety of his conduct and misled others, all in an effort to elevate the wishes of the client above the "integrity of the judicial process." *Matter of Neitlich, supra.*

b. *Investigative techniques.* Crossen argues that he had a good faith belief that his conduct was proper, and that his "subjective belief was objectively reasonable, as illustrated by contemporaneous scholarly commentary." He leans particularly on an article coauthored by a former chair of the American Bar Association's Standing Committee on Professional Responsibility, D.B. Isbell and L.N. Salvi, Ethical Responsibility of Lawyers for Deception by Undercover Investigators and Discrimination Testers: An Analysis of the Provisions Prohibiting Misrepresentation Under the Model Rules of Professional Conduct, 8 Geo. J. Legal Ethics 791 (1995) (ethics article). Crossen does not claim that he took guidance from, or even read, the ethics article in the course of the relevant events in this case.[41] More importantly, the ethics article does not discuss, much less endorse, the kind of ruse at issue here. The ethics article's thrust, as Crossen says, is that public and private attorneys who act as investigators and testers conducting undercover investigations or undertaking discrimination testing to gather evidence they otherwise would be unlikely to obtain voluntarily, or who supervise others in such conduct, do not violate rules 4.1 (a)[42] and 8.4 (c)[43] of the ABA Model Rules of

---

[41]The ethics article seems not to have garnered much judicial support. In the thirteen years since its publication, it has been cited by three Federal trial courts and one State court, and generally in connection with matters of dicta. See *Gidatex, S.r.L.* v. *Campaniello Imports, Ltd.*, 82 F. Supp. 2d 119, 123 (S.D.N.Y. 1999); *Essex County Jail Annex Inmates* v. *Treffinger*, 18 F. Supp. 2d 418, 435 (D.N.J. 1998); *Apple Corps. Ltd.* v. *International Collectors Soc'y*, 15 F. Supp. 2d 456, 475-476 (D.N.J. 1998); *In re Gatti*, 330 Or. 517, 531 (2000).

[42]Rule 4.1 of the ABA Model Rules of Professional Conduct provides: "In the course of representing a client a lawyer shall not knowingly:

"(a) make a false statement of material fact or law to a third person . . . ."

[43]Rule 8.4 of the ABA Model Rules of Professional Conduct, provides: "It is professional misconduct for a lawyer to:

". . .

"(c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation . . . ."

Professional Conduct, which forbid making false statements or material misrepresentations. See, e.g., *id.* at 816. However, Crossen omits the important caveat of the ethics article's thesis, namely, that it applies only to "elementary, and essential, misrepresentations as to identity and purpose made by discrimination undercover investigators and testers." *Id.* at 826. See *id.* at 812 ("Rule 8.4 [c], which prohibits conduct involving dishonesty, fraud, deceit or misrepresentation, would not apply to misrepresentations of the *mild sort necessarily* made by discrimination testers and undercover investigators" [emphasis added]). The article makes clear that where the "misrepresentations are of a graver kind, or when a tester/investigator is used by the lawyer specifically for something the lawyer is forbidden to do, or when the lawyer directs a tester/investigator to engage in activities that violate the rights of others," the Model Rules of Professional Conduct are implicated, regardless whether the attorney is private or public counsel. See *id.* at 829. According to the authors of the ethics article, specific conduct that violates Model Rules 4.1 (a) and 8.4 (c) includes a lawyer acting in his or her capacity as a lawyer who makes "misrepresentations of material fact," *id.* at 815, as well as a lawyer engaging in conduct or supervising conduct that employs "excessively intrusive investigative techniques," "entrapment," or involves "an actionable invasion of privacy," *id.* at 826-827. Such conduct violates, in the words of the ethics article, the "quite fundamental concept that lawyers, when they are acting in their professional capacity, are expected by courts, their professional colleagues, their clients and the general public alike to measure up to a higher standard of conduct than that expected of ordinary citizens . . . a standard of candor and fairness that does not necessarily apply in the ordinary exchanges among persons who do not purport to own any professional credentials, or to adhere to corresponding professional standards." *Id.* at 815. It is clear from what we have said to this point that Crossen's conduct fails even the ethics article's test.

To further support Crossen's argument that it was reasonable for him in 1997 to presume that public and private attorneys could conduct undercover stings using the methods he invoked, Crossen cites several cases involving underlying criminal matters, including *United States* v. *Klubock*, 639 F. Supp. 117,

125-126 (D. Mass. 1986), aff'd, 832 F.2d 664 (1st Cir. 1987) (no violation of supremacy clause of United States Constitution in applying State ethical rule to Federal prosecutors). See *United States* v. *Talao*, 222 F.3d 1133, 1139-1140 (9th Cir. 2000) (providing historical context for dispute over application of State ethical rules to Federal attorneys); *Stern* v. *United States Dist. Court for the Dist. of Mass.*, 214 F.3d 4, 8 (1st Cir. 2000) (discussing application of State ethical rule to Federal prosecutors). While these cases indicate some contemporaneous uncertainty regarding whether State ethical rules applied to Federal prosecutors,[44] they do little to bolster Crossen's case. The crucial factor distinguishing government and private attorneys is the lack of oversight for the latter. Whatever leeway government attorneys are permitted in conducting investigations, they are subject not only to ethical constraints, but also to supervisory oversight and constitutional limits on what they may and may not do, constraints that do not apply to private attorneys representing private clients. See, e.g., F.C. Zacharias & B.A. Green, The Uniqueness of Federal Prosecutors, 88 Geo. L.J. 207, 228-229 (2000). These constraints include due process protections, the Fourth and Fifth Amendments to the United States Constitution, and special ethical rules. See *United States* v. *Armstrong*, 517 U.S. 456, 464 (1996) (prosecutor's discretion is "subject to constitutional constraints," including those imposed by equal protection component of due process clause of Fifth Amendment); *United States* v. *Agurs*, 427 U.S. 97 (1976) (due process requires prosecutors to disclose exculpatory evidence); *Giglio* v. *United States*, 405 U.S. 150, 152-155 (1972) (due process requires prosecutors to disclose promises offered by government to witness); *Weeks* v. *United States*, 232 U.S. 383, 391-392 (1914) ("The effect of the Fourth Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority"); *Commonwealth* v. *Tucceri*, 412 Mass. 401, 408 (1992) (prosecu-

---

[44]Congress ended this uncertainty with passage of the McDade Amendment in 1998, which provides that Federal lawyers are subject to State rules "to the same extent and in the same manner as other attorneys." 28 U.S.C. § 530B (2006).

tors must reveal exculpatory evidence in light of duty "to administer justice fairly"); *Commonwealth* v. *Tabor*, 376 Mass. 811, 819-820 (1978) (recognizing prosecutor's obligation "to secure a fair and impartial trial"); Mass. R. Prof. C. 3.8 comment 1, 426 Mass. 1397 (1998) (imposing additional ethical obligations on prosecutors, because "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate").

Constraints on government agents ensure that even undercover investigations conducted by government attorneys are reined in by the stringent constitutional requirements of fair and impartial justice. Crossen's argument that he felt empowered as a private attorney to conduct the same kind of sting operation he could have conducted as a prosecutor both overstates the independence of prosecutorial power and understates the unique restraints and oversight on that power.

Crossen, in short, has not succeeded in persuading us that his conduct did not violate the ethical rules under which this information was brought. We turn now to his remaining arguments.

5. *Due process.* Crossen argues that the procedures followed by the special hearing officer denied him an adequate opportunity to defend himself because Canon 1, DR 1-102 (A) (5) (conduct prejudicial to administration of justice), is "so broad" that it raises a due process concern about "potential random application"; the special hearing officer did not permit Crossen's expert witness or the expert witnesses of his corespondents to testify; the special hearing officer struck Crossen's affirmative defense of selective prosecution; and the special hearing officer refused to issue certain subpoenas that Crossen sought. We have considered each of these objections and, for the reasons below, conclude that each is without merit.

a. *Vagueness of DR 1-102 (A) (5).* An attorney must be afforded due process of law, including fair notice of the charges and an opportunity to be heard, before he can be deprived of his constitutionally protected interest in his license to practice law. *Matter of Kenney*, 399 Mass. 431, 435 (1987). See *In re Ruffalo*, 390 U.S. 544, 550 (1968). Due process requires fair notice of the proscribed conduct, meaning that attorneys may not be subject to rules that are so broad that they implicate concerns about "potential random application or unclear meaning," i.e.,

rules that are unconstitutionally vague. *Matter of Discipline of an Attorney*, 442 Mass. 660, 668 (2004).

Crossen argues that DR 1-102 (A) (5) is a "catch all" provision that is so vague as to raise due process concerns "at least when it forms the sole basis of discipline." The argument is unavailing here, because DR 1-102 (A) (5) is *not* the sole, or even the dominant, basis of discipline. And Crossen's argument that the rule is unconstitutionally vague as a stand-alone basis for sanctions was considered and rejected in *Matter of the Discipline of Two Attorneys*, 421 Mass. 619, 629 (1996), where we limited the reach of the rule, as the sole basis of discipline, to those activities that are so "egregious" as to "undermine the legitimacy of the judicial process." "Egregious" meant in 1997 what it means today: "Extremely or remarkably bad; flagrant." Black's Law Dictionary 534 (8th ed. 2004). While we need not and do not consider Crossen's conduct under DR 1-102 (A) (5) alone, we agree with the board that prior bar disciplinary law and prevailing professional norms, as well as his own colleagues' understandable misgivings about his conduct, placed Crossen on notice that, in the board's words, "such outrageous conduct" was proscribed.[45]

We conclude as well that, acting with reason, Crossen should have known that his efforts to intimidate the law clerk with threats of disclosure unless the law clerk produced sworn statements damaging to Judge Lopez was prejudicial to the administration of justice: it was intended or was likely to produce from the law clerk testimony more critical of Judge Lopez than the law clerk otherwise would or could have given.[46,47]

---

[45]We apply a less stringent due process standard than that applied to criminal statutes. The guiding principle is whether a reasonable attorney would have been put on notice that his conduct was proscribed. *Matter of the Discipline of an Attorney*, 442 Mass. 660, 669 (2004).

[46]The board found that Crossen's "efforts to intimidate the law clerk with threats of disclosure, coupled as they were with misrepresentations about their likelihood and imminence — while perhaps a somewhat closer call — seem to us sufficiently 'violative of accepted professional norms' " as to implicate DR 1-102 (A) (5). In considering the intended objective of Crossen's coercive conduct — to produce sworn but likely inflated, if not false, testimony designed to impugn the integrity of a sitting judge in an ongoing matter — we do not share the board's reservations.

[47]In his submissions to the board, Crossen also apparently raised due process

b. *Exclusion of expert testimony.* At his bar disciplinary hearing, Crossen proffered as expert testimony a letter written by Professor Charles Wolfram, an acknowledged authority on legal ethics. Professor Wolfram's letter was written in 1999 to the United States Department of Justice in support of Crossen's attempt, which succeeded, to avoid Federal indictment for his conduct in the law clerk matter.[48] The special hearing officer granted bar counsel's motion in limine to exclude the testimony. The chair of the board denied Crossen's appeal from this ruling. Crossen argues that Wolfram's testimony, and the testimony of the experts proffered by Curry and Donahue in their cases, which the special hearing officer also excluded, was "sine qua non for a fair hearing" because their testimony speaks to the issue whether Crossen's conduct was within contemporaneous ethical norms. Anything less than the admission of Wolfram's testimony, Crossen argues, "offends the concept of due process." There was no error.

Expert testimony is not required in bar disciplinary proceedings to establish a rule violation, see *Matter of Tobin*, 417 Mass. 81, 86 (1994), or to establish a standard of care, see *Matter of Buckley*, 2 Mass. Att'y Discipline Rep. 24, 25 (1980). Indeed, generally, "[e]xpert testimony concerning the fact of an ethical violation is not appropriate" in bar disciplinary proceedings because the fact finder does not need assistance understanding and applying the ethical rules. *Fishman* v. *Brooks*, 396 Mass. 643, 650 (1986) (commenting in legal malpractice case that expert testimony of law professor concerning ethical duties of attorneys in general and plaintiff's attorney in particular was not appropriate). The special hearing officer was an experienced Massachusetts attorney who had the opportunity to see and hear

challenges under DR 1-102 (A) (6), which he has not raised in his briefs to this court. To the extent that Crossen raises here a vagueness challenge to DR 1-102 (A) (4), he does so only in passing, and we do not address it.

[48]Professor Wolfram's letter opined, in essence, that "[a]fter review of the facts in this matter, it is my opinion, in summary form, that the activities of Mr. Crossen, constrained by the situation in which his client was situated, were justifiable in the circumstances and conformed to the standards of practice that would have been observed by lawyers of ordinary care and prudence in the same or similar circumstances."

Professor Wolfram's letter was also appended to Crossen's answer to bar counsel's disciplinary complaint.

the testimony of twenty-one witnesses and to consider numerous exhibits. We do not question Professor Wolfram's fluency with the ethical rules. But we accept the special hearing officer's decision that nothing the expert opined could have assisted her in wading through multiple conflicting accounts of key events, including testimony and cross-examination, to arrive at her ultimate factual findings.[49] See *Matter of LiBassi*, 449 Mass. 1014, 1017 (2007) (hearing committee properly exercised its discretion to exclude expert testimony regarding mitigation). See also *Commonwealth* v. *Santoli*, 424 Mass. 837, 843-844 (1997) (expert testimony need not be admitted where it would not aid fact finder).

In addition to challenging the exclusion of Professor Wolfram's testimony, Crossen challenges the exclusion of experts proffered by his corespondents, Curry and Donahue. There is no basis for this claim. In a civil case, a respondent generally may not challenge the exclusion of evidence offered by his corespondent if he did not move for admission of that evidence at his own hearing. In his opposition to bar counsel's motion in limine to exclude expert testimony, Crossen did not make any request that the special hearing officer allow his corespondents' experts to testify.[50] He may not challenge that exclusion on appeal.

Even assuming that Crossen may challenge the exclusion of testimony offered by the other two respondents linked to this affair, Donahue and Curry, we conclude that the special hearing officer did not abuse her discretion in excluding that evidence. With regard to the testimony of a former Attorney General of the Commonwealth, offered by Curry, his testimony was likely not relevant, as the expert intended to testify regarding the norms for undercover investigations in criminal law enforcement, a point addressed earlier. We also reject Crossen's challenge to the exclusion of Donahue's proffered witness, a former president of the Massachusetts Bar Association, who would have supported Donahue's claim that a reasonable attorney in Donahue's position

[49]Wolfram's letter does not indicate specifically what documents he reviewed, although he states that he reviewed all of the documents provided to the United States Department of Justice, as well as other documents. We are not informed as to the content of either group of documents.

[50]Crossen did "incorporate" Donahue's opposition to bar counsel's motion in limine. That opposition is not in the record.

would have investigated the allegations of bias and predisposition. As we discussed earlier, there is no suggestion that Crossen should not have investigated the allegations of judicial conduct. Rather, the fault lay in his methods.

c. *Selective prosecution defense.* Crossen asserts that the special hearing officer deprived him of due process when she struck his affirmative defense of selective prosecution and refused to issue his requested subpoenas because those rulings "increased the risk of arbitrary application of the rules based on subjective considerations of the differences between government attorneys and private counsel."[51] We disagree.

The defense of selective prosecution, typically used in criminal cases, asserts that a prosecutor has "brought the charge for reasons forbidden by the Constitution," i.e., due to membership in a class in violation of the equal protection clause. *United States* v. *Armstrong*, 517 U.S. 456, 463-464 (1996). To prove such a claim, the defendant must present "clear evidence" that a prosecutor acted so directly against a particular class of persons as to deny them equal protection. *Id.* at 464. He must demonstrate that the selective prosecution "had a discriminatory intent and was motivated by a discriminatory purpose." *Id.* at 465, quoting *Wayte* v. *United States*, 470 U.S. 598, 608 (1985). Even assuming arguendo that Crossen's claim has validity in the context of a bar disciplinary proceeding, a matter we do not decide, Crossen has failed to adduce any evidence of bar counsel's discriminatory intent or purpose. See *In re Gatti*, 330 Or. 517, 533-535 (2000) (rejecting attorney's claim of selective prosecution where attorney failed to show that State bar had policy of prosecuting lawyers in private practice but not government lawyers who violated disciplinary rules). Nor has he shown that he is a member of a protected class.

d. *Subpoenas.* Having concluded that the special hearing officer did not err when she struck the defense of selective prosecution, we need not address at length Crossen's argument that the special hearing officer improperly refused to issue his requested

---

[51]Crossen's response also asserted that bar counsel's selective prosecution denied him equal protection of the laws. He does not raise this argument on this appeal, and accordingly we deem it waived. Mass. R. A. P. (16) (a) (4), as amended, 367 Mass. 921 (1975).

subpoenas, and do so only summarily. Through his counsel, Crossen sought to subpoena keepers of the record from every Massachusetts county district attorney's office, from the board, from this court, and from the United States Attorney's Office, among others, seeking any and all information (not limited by date) concerning "the imposition of any public discipline . . . on any prosecutor in connection with a pretextual investigation conducted under his or her supervision or for causing a surreptitious, lawful recording of a conversation." Crossen makes little effort to specify in what way the materials sought was "probative" or "the kind of evidence on which reasonable persons are accustomed to rely in the conduct of serious affairs," as required by G. L. c. 30A, § 11 (2), which pertains to board proceedings pursuant to rule 3.2 of the Rules of the Board of Bar Overseers (2007). See *Matter of Johnson, ante* 165, 169-170 (2007) (upholding hearing officer's quashing of irrelevant subpoenas issued by respondent). Rather, he makes the conclusory claim that the exclusion of the evidence "led directly to a recommendation of disbarment." We need not and do not consider such skeletally developed appellate argument. See *Zora* v. *State Ethics Comm'n*, 415 Mass. 640, 642 n.3 (1993). In any event, given the sharp distinction we addressed earlier between undercover investigations undertaken by agents of the government and investigations undertaken by private parties, such information would not in any event be probative in this case.

Having rejected each of Crossen's arguments challenging the board's conclusion that he violated our disciplinary rules, we turn to the issue of sanction.

6. *Sanction.* Our primary concern in bar discipline cases is "the effect upon, and perception of, the public and the bar." *Matter of Finnerty*, 418 Mass. 821, 829 (1994), quoting *Matter of Alter*, 389 Mass. 153, 156 (1983). In reviewing the board's recommended sanction, therefore, we must consider "what measure of discipline is necessary to protect the public and deter other attorneys from the same behavior." *Matter of Concemi*, 422 Mass. 326, 329 (1996). We give substantial deference to the board's recommendation, *Matter of Griffith*, 440 Mass. 500, 507 (2003), and our task includes determining whether the sanction is "markedly disparate from judgments in comparable

cases." *Matter of Foley*, 439 Mass. 324, 333 (2003), quoting *Matter of Finn*, 433 Mass. 418, 422-423 (2001). Fundamentally, "[e]ach case must be decided on its own merits and every offending attorney must receive the disposition most appropriate in the circumstances." *Matter of the Discipline of an Attorney*, 392 Mass. 827, 837 (1984).

In considering whether the sanction of disbarment is markedly disparate from sanctions in comparable cases, we are immediately struck, as was the special hearing officer, by the sui generis nature of the law clerk episode, ultimately orchestrated and driven by Crossen. Countless bar disciplinary cases concern relatively discrete events of misconduct involving one attorney, and one or a few transactions or clients. We have found none that involves such a large number of attorneys and their agents, or deceit so exquisitely choreographed as to include in one bundle surreptitious tape recording, traveling out of State to avoid the laws of Massachusetts, the masking of multiple identities, the procurement of sham business cards and sham business information, multiple sham interviews, covert surveillance, and multiple threats and attempts at coercion, among other things.

Crossen tries to disaggregate this pattern of misconduct, and then argues that disbarment is unwarranted because bar disciplinary cases dealing with individual categories of the misconduct proven here have resulted in lesser sanctions.[52] We reject his effort, as did the special hearing officer and the board. Cumulative and wide-ranging misconduct may warrant the sanction of disbarment, even if the individual instances of unethical conduct would not warrant so severe a sanction. See, e.g., *Matter of Cobb*, 445 Mass. 452 (2005) (multiple instances of misconduct demonstrated respondent's unfitness to practice law); *Matter of Fitzgerald*, 22 Mass. Att'y Discipline Rep. 319, 323 (2006) (disbarment appropriate in light of "cumulative nature" of respondent's misconduct); *Matter of Ulin*, 18 Mass. Att'y Discipline Rep. 549, 555 (2002) ("Although no single act com-

---

[52]Crossen urges, for example: "Whether measured against cases involving bullying, misrepresentations, trickery *or* unethical tape recording, disbarment is markedly disparate and should be rejected because it is not the most appropriate to Crossen in those circumstances" (emphasis added). Crossen's conduct involved an amalgam of all these improper behaviors.

mitted by the defendant would, by itself, normally warrant this severe a penalty, [hearing officer] must consider the cumulative effect of the respondent's many infractions").[53] In considering the appropriate sanction, we will not ignore the "totality of the circumstances." *Matter of McInerney*, 389 Mass. 528, 531 (1983).[54]

The special hearing officer concluded that the closest comparable case was *Matter of Foley*, 439 Mass. 324 (2003). In that case, an attorney was suspended for three years for assisting his client in preparing false testimony in defense of a criminal charge. Unbeknownst to the attorney, the client was a Federal agent posing as a criminal defendant as part of an investigation into corruption at a court. Influenced by the "planning, the premeditation, and the level of manipulation present in the respondent's conduct," we imposed a three-year suspension. *Id.* at 339. Comparing this case to *Matter of Foley, supra,* the special hearing officer concluded that "no suspension shorter than three years would be adequate" in this case and disbarment is appropriate due to the absence of "special" mitigating factors and the presence of "very powerful aggravating circumstances."

As Crossen correctly points out, the offense in the *Foley* case, suborning perjury, was by its very nature harmful to the admini-

---

[53]The board specifically found that, had Crossen abandoned his scheme after the New York interview and not proceeded to "compound [his] misconduct by ambushing, threatening or lying to [the law clerk]," then the proposed sanctions "might have been quite different." We express no opinion on this issue.

[54]With respect to sanctions for threatening behavior, Crossen expends considerable effort arguing that bar counsel should have charged him with violating Canon 7, DR 7-105 (A), which provides: "A lawyer shall not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter." The reason he was not charged with violating DR 7-105 but was charged with violating the "catch-all" provisions of DR 1-102 (A) (4)-(6) and DR 7-102 (A), Crossen claims, is that sanctions levied under DR 7-105 prior to 1997 were relatively modest. This argument is both speculative and irrelevant, and we do not consider it.

Crossen also cites disciplinary cases involving misrepresentation and trickery that generally entailed sanctions in the form of suspensions ranging from six months to two years. See, e.g., *Matter of McCarthy*, 416 Mass. 423 (1993) (one year); *Matter of Neitlich*, 413 Mass. 416 (1992) (one year); *Matter of Thurston*, 13 Mass. Att'y Discipline Rep. 776 (1997) (six months). The special hearing officer correctly noted that these proceedings "involved isolated incidents of deception — nothing like the protracted and destructive ruse employed against [the law clerk]" or Crossen's subsequent "attempts at extortion and intimidation."

stration of justice, meriting the severe sanction of disbarment. The respondent in that case escaped that sanction only because his plan did not come to fruition; the witness did not testify. Crossen is correct that *Matter of Foley, supra,* is not a case comparable to Crossen's, but we do not accept Crossen's conclusion that his own conduct "pales to insignificance against Foley's 'prolonged and close embrace of false testimony.' " See *Matter of Foley, supra* at 335.

Coaching a witness to lie on the stand is one kind of egregious violation of professional ethics. Another is conduct of the kind perpetrated by Crossen, including attempting to pry through trickery and coercion into the confidential communications between the judge and a law clerk in an ongoing case; doing so at the behest of a client who was a dissatisfied litigant in the case for the purpose of removing the judge from that case and undoing her prior decisions; creating an alternative universe of deception to accomplish these aims; attempting to entrap a third party, the law clerk, who had absolutely nothing to do with creating or inciting the alleged prejudice of the judge; causing extreme distress in the lives of the wife of the law clerk and the judge's family, who had no relationship to the case or to Crossen's client; encouraging his client's pursuit of the judge, and more. Although it did not involve suborning perjury, Crossen's behavior, in its cumulative effect on the administration of justice and the public's perception of our judicial system and on the legal profession, was unarguably damaging.

That there is no blueprint in our prior cases for the facts of this proceeding should come as no surprise, reflecting the unusual scope of the misconduct. The sanction of disbarment we impose is appropriate to ensure that the law clerk episode (or anything like it) remains sui generis.

a. *Mitigation.* The imposition of appropriate sanctions requires us to consider circumstances in mitigation. *Matter of Finn,* 433 Mass. 418, 424 (2001). Crossen makes two arguments with respect to mitigation.[55] First, he contends that mitigation is appropriate because he was not indifferent to the ethical dilemma

---

[55]The special hearing officer found, in mitigation, that Crossen enjoyed a reputation for excellence in the legal community, but she noted this is a "typical" mitigating factor "not given great weight in determining the appropriate

he faced and acted in good faith in the face of ethical rules that were "murky." This argument fails for two principal reasons. It relies on the premise, rejected above, that the ethical rules were "murky." The special hearing officer found that Crossen did not act in good faith, a conclusion that finds ample support in the record.[56]

Second, Crossen argues that mitigation is appropriate in light of bar counsel's substantial delay in the prosecution of his case. He notes that he urged bar counsel to pursue investigation into his conduct even though the FBI investigation was ongoing. Bar counsel's failure to do so, he contends, both prejudiced his defense and resulted in extended public opprobrium, factors that should mitigate the sanctions against him. See *Matter of Grossman*, 448 Mass. 151, 152 (2007) (delay "does not constitute a mitigating factor absent proof that the delay has substantially prejudiced the defense, or evidence of resulting public opprobrium").[57] Specifically, Crossen asserts that he met his burden of proof that he was harmed by the delay, see *id.* at 159, because, first, the deaths of Reid and McCain before the hearing commenced directly harmed his ability to substantiate his version of events.[58] Second, he contends that the sanction imposed on him should be tempered by the "withering effects of publicity over

sanction." The board indicated that the only possible "special," i.e., not "typical," mitigating factor was Crossen's motivation in conducting the investigation. The board noted that "[t]here may be some reason to question the hearing officer's ultimate finding that Crossen was driven by the desire to continue receiving the substantial fees" rather than by the "ardor to serve [his] clients zealously." The board concluded, however, that it "need not resolve that issue here, as there is ample ground to support disbarment for Crossen, and a decision to reject the hearing officer's finding on the point would not alter the disposition we recommend." Crossen did not raise this issue here.

[56]The special hearing officer specifically found that Crossen lacked good faith in stating that he was relying on the decision in *Miano* v. *A.C. & R. Advertising, Inc.*, 148 F.R.D. 68, 81, aff'd, 834 F. Supp. 632 (S.D.N.Y. 1993), in arranging the surreptitious tape recording in New York.

[57]Then Chief Justice Mulligan of the Superior Court filed a grievance against Crossen, Curry, and Donahue with the board on September 26, 1997, shortly after the press conference in which the law clerk and his attorney disclosed the attorneys' conduct. The FBI investigation into the respondents' behavior concluded on or about February 1, 2001. Bar counsel filed a formal petition for discipline against the attorneys on January 3, 2002.

[58]Reid died in October, 2000, and McCain died in October, 2001.

the last ten years which have already punished Crossen." The special hearing officer concluded, in essence, that the delay was reasonable because it would have been "unreasonable to expect Bar Counsel to investigate and try the case piecemeal, particularly given the likelihood that the other Respondents . . . intended either to invoke their rights against self-incrimination while the FBI's investigation was ongoing (Donahue) or were not responding to Bar Counsel inquiries (Curry)."[59]

We do not condone the length of delay in this case. Nevertheless, we do not find the delay to require mitigation of Crossen's sanction. First, Crossen has not met his burden of demonstrating that the testimony of either Reid or McCain would have aided his defense in any significant way. Because the allegations against Crossen were corroborated from so many percipient witnesses, "the inability to interrogate [the deceased] witnesses was not substantially prejudicial." *Matter of Gross*, 435 Mass. 445, 451 (2001), quoting *Matter of Kerlinsky*, 406 Mass. 67, 75 (1989), cert. denied, 498 U.S. 1027 (1991). The wealth of corroborative testimony makes it "speculative at best," *Matter of Gross*, *supra*, that Reid and McCain would have been helpful to Crossen, let alone substantially so.[60] Moreover, Crossen had the ability to preserve McCain's testimony as late as 2001, but failed to do so. See Rules of the Board of Bar Overseers § 4.9 (2007) (permitting depositions to preserve testimony when it appears that prospective witness may be unable to testify because of age, illness or other infirmity).[61] He "cannot now

[59]Crossen is correct that a delay need not be "undue" or "unreasonable" in order to be mitigating. See *Matter of McBride*, 449 Mass. 154, 165 (2007) (noting that there were numerous "legitimate reasons" for delay in disciplinary proceedings, but emphasizing that it was "[m]ost important" that respondent was not prejudiced by delay). It is prejudice to the respondent that is the decisive factor. See *Matter of Grossman*, 448 Mass. 151, 159 (2007).

[60]Crossen does not suggest any testimony Reid may have given that would have assisted his own defense. Crossen speculates that McCain's testimony would have been helpful in his defense that he had no knowledge of the law clerk's being under surveillance on August 25, but Crossen admits that he was aware of other instances of surveillance on the law clerk.

[61]The record is not clear whether Crossen had notice of McCain's impending death. Because Crossen and McCain were, in Henry's words, "good friends," Crossen was more likely than others involved in the bar proceedings to know the status of McCain's health.

argue prejudice from his inaction." *Matter of McBride*, 449 Mass. 154, 166 (2007).

As to Crossen's second argument concerning delay, we conclude that, in the circumstances of this case, Crossen's "public opprobrium" defense also does not mitigate the sanction of disbarment. He relies on *Matter of Gross, supra* at 451-452, in which we stated that "where an attorney has been subjected to a considerable period of public opprobrium while awaiting formal discipline, the delay will have already inflicted an unofficial sanction, and the formal sanction should take into account what the attorney has suffered while awaiting resolution of the charges." The board rejected this argument, concluding that Crossen failed to show that the "withering publicity" stemmed from the delay in the disciplinary proceeding rather than "from actions by private parties (like [the law clerk's] press conference), the federal criminal investigation, and press interest." But Crossen does not bear this burden. Rather, he must show that public opprobrium occurred during the period of delay, regardless whether it was caused by the actions of third parties.

In *Matter of Gross, supra*, we considered whether an unexplained six-year delay between the respondent's unethical conduct and the filing of a petition for discipline was mitigating even though it caused no substantial prejudice. *Id.* at 450-452. We wrote that public opprobrium during a delay may be a mitigating factor, but that it did not apply in that case as "[t]here was no public awareness of any pending investigation of charges against the respondent . . . ." *Id.* at 452. Here, in contrast, Crossen testified that he suffered a loss of income as a result of the publicity, as well as a loss in reputation. There is no denying that bar counsel's delay in filing the petition for discipline, and the board's delay in hearing the case, prolonged Crossen's "public embarrassment, humiliation, or anxiety." *Id.* at 452.

We decline, however, to assign any mitigating weight to the negative publicity where Crossen's conduct is, and always was, worthy of disbarment. We have concluded that Crossen should be disbarred for his conduct, and almost assuredly would have been disbarred had bar counsel filed its petition in 1997, rather than in 2002. We decline to mitigate that sanction due to public opprobrium during the delay, especially where Crossen has been permitted to continue practicing law until now.

We now consider factors in aggravation.

b. *Aggravation.* The special hearing officer concluded that the "aggravating circumstances have great weight in this case." Both she and the board found three factors particularly significant in aggravation. On our own careful review of the record, we agree with respect to all three. First, Crossen's substantial experience was properly weighed in aggravation. See *Matter of Luongo,* 416 Mass. 308, 312 (1993) ("An older, experienced attorney should understand ethical obligations to a greater degree than a neophyte"). Second, and even more compelling, was Crossen's "marked" lack of candor in the disciplinary proceedings. See *Matter of Eisenhauer,* 426 Mass. 448, 457, cert. denied sub nom. *Eisenhauer* v. *Massachusetts Bar Counsel,* 524 U.S. 919 (1998); *Matter of Friedman,* 7 Mass. Att'y Discipline Rep. 100, 103 (1991). The special hearing officer was constrained to remark throughout her report that Crossen's sworn testimony on specific issues was "not credible," "not believable," "deliberately false and evasive," "deliberately false," and otherwise at variance with the truth. Coupled with the "cumulative nature" of his misconduct, Crossen's lack of candor before the special hearing officer is an aggravating factor in his appropriate punishment. *Matter of Eisenhauer, supra.* See *Bar Ass'n of Boston* v. *Sleeper,* 251 Mass. 6, 20 (1925) (observing, while reviewing imposition of disbarment by single justice on attorney who lied under oath in bar disciplinary proceedings before that justice, that "the commission of perjury by an attorney at law is sufficient ground for disbarment," but remanding to single justice because attorney was not given due notice of charge of perjury); *Matter of Sprei,* 10 Mass. Att'y Discipline Rep. 246, 249 (1994) (imposing disbarment on attorney who failed to cooperate with bar counsel, submitted fabricated evidence to bar counsel, and lied under oath to bar counsel, observing that these violations "were comparable to making false representations to a court").

Finally, the "most powerful factor in aggravation," concluded the special hearing officer, and subsequently the board, was Crossen's "total lack of concern and compassion for how [the ruse] would affect [the law clerk]."[62] Noting that the law clerk was a "young, innocent and vulnerable victim," the special

---

[62]The special hearing officer declined bar counsel's request to find the

hearing officer was "repelle[d]" by the way Crossen "targeted and exploited him," bringing him "to the brink of desperation." The board concluded that the special hearing officer weighed this factor appropriately.

Although cases finding aggravation due to the naivete or vulnerability of the victim typically involve a lawyer-client relationship, see, e.g., *Matter of McBride*, 449 Mass. 154, 165 (2007); *Matter of Cobb*, 445 Mass. 452, 480 (2005); *Matter of McIntyre*, 426 Mass. 1012, 1015 (1998), the concern behind those cases extends to all third parties who are manipulated by an attorney's unethical behavior. Here, as we noted above, the victims of Crossen's dupery were not only the law clerk and Judge Lopez, but also their families. While we express no view on whether Crossen's willingness to prey on vulnerable third parties was "the most powerful factor in aggravation," we agree that the special hearing officer and the board were correct to weigh it heavily.

Considering Crossen's sustained and multifaceted misconduct, the lack of significant mitigating factors, and the presence of substantial aggravating factors, we conclude that Crossen must be disbarred. "The right to practice law is not one of the inherent rights of every citizen . . . [but] is a peculiar privilege granted and continued only to those who demonstrate special fitness in intellectual attainment and in moral character." *Matter of Keenan*, 314 Mass. 544, 546 (1943) (annulling reinstatement order for attorney who was disbarred for bribing jury member). The purpose of disbarment is "to exclude from the office of an attorney in the courts, for the preservation of the purity of the courts and the protection of the public, one who has demonstrated that he is not a proper person to hold such office." *Matter of Hiss*, 368 Mass. 447, 453 (1975), quoting *Keenan, petitioner*, 310 Mass. 166, 169 (1941) (reinstating after twenty-three years attorney who was disbarred for conviction of perjury). In this case, disbarment is the only sanction that will reassure the public that the kinds of nefarious conduct at issue here have no place in the attorney's repertoire or in our courts.

respondents' refusal to acknowledge that their conduct was wrong to be a factor in aggravation, and stated that she would not "penalize the Respondents for mounting vigorous defenses against the charges."

We are mindful of the severity of this sanction, and its consequences for the livelihood and the reputation of a once well-regarded attorney. But the gravity of Crossen's misconduct, the harm he has caused to the administration of justice, to individuals, and to the public's trust in the integrity of the legal profession, render him unfit to retain the office of attorney.

7. *Conclusion.* For the reasons stated above, we adopt the recommendation of the board and remand to the county court where a judgment of disbarment shall enter.

*So ordered.*